## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| SHAWN SHANNON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No.  18-CV-02233 |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

## THE UNITED STATES OF AMERICA'S RESPONSE TO
## PETITIONER'S MOTION PURSUANT TO 28 U.S.C. § 2255

The United States of America, by John C. Milhiser, United States Attorney for the

Central District of Illinois, through undersigned government counsel, respectfully

requests that this Court dismiss, without an evidentiary hearing, the Petitioner's Motion

to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. In support, the

United States submits the following:

## I.  Factual And Procedural Background[1]

---

[1] Our citations to the record use the following abbreviations: "D.E." means "docket entry"; "R." followed by a number refers to the document bearing that number on the district court's docket sheet in the underlying criminal case (2:15-cr-20014); references to the record in this case (2:18-cv-02233) are to "RII.____"; references to the transcript of the three days of the criminal trial are to "Tr.I____", "Tr.II____", and "Tr.III____", (R.119,120,121) respectively; and references to the government exhibits at trial are to "Ex._____."  The presentence report ("PSR") was revised on multiple occasions; citations are to the final revised PSR, which is found at R.108.  The petitioner filed an amended motion (R.II11) and an amended memorandum (R.II13), with accompanying exhibits, which encompassed his original pleadings (R.II1; R.II4); therefore references to petitioner's amended pleadings are to "Pet. Mot.", "Pet. Br.", and "Pet. Ex.", respectively.

A grand jury in the Central District of Illinois charged the petitioner Shawn Shannon with nineteen counts of sexual exploitation of a minor (one count for each of the nineteen photos taken of the minor) and distribution of child pornography. R.45.[2] During a three-day jury trial, the government presented overwhelming evidence of Shannon's guilt. D.E. 7/25/2016, 7/26/2017, 7/27/2017.

The Hon. Colin S. Bruce, United States District Court Judge, ("Judge Bruce") presided over the *Shannon* criminal proceedings.  Prior to receiving his commission on October 8, 2013, Judge Bruce served as an Assistant U.S. Attorney ("AUSA") in the Central District of Illinois, beginning in 1989. *See* Questionnaire for Judicial Nominees, United States Senate Committee on the Judiciary, Responses to Questions 6 and 16(a).[3]  Between 2007 and 2010, Judge Bruce served as the Supervisory AUSA of the Urbana Branch Office of the U.S. Attorney's Office for the Central District of Illinois ("USAO"), and between 2010 and October 2013, he served as the Office's First Assistant U.S. Attorney under United States Attorney James A. Lewis. *Id.*, Response to Question 16(a).

AUSA Elly Peirson, who was on detail to United States Department of Justice, Criminal Division, Child Exploitation and Obscenity Section, ("CEOS"), in Washington, DC, at the time, and AUSA Maureen Cain, then a trial attorney with CEOS[4], prosecuted

---

[2] The original indictment, filed on May 6, 2015, charged Shannon with sexual exploitation of a minor and possession of child pornography, following his arrest on a criminal complaint on April 15, 2015. R. 1; R. 10; D.E. 4/15/2015.

[3] Found at https://www.judiciary.senate.gov/imo/media/doc/061913QFRs-Bruce.pdf (last viewed February 26, 2019).

[4] Ms. Cain is currently an AUSA in the Eastern District of Virginia.

this case.  Paralegal Specialist Staci Klayer, with the U.S. Attorney's Office, provided in-court litigation support to the prosecution team.

Shawn Shannon was represented at trial by defense counsels, Kevin P. Bolger and Sami Z. Azhari.  Mr. Bolger and Mr. Azhari mounted an alternative suspect defense and claimed that "someone else" took the pictures. Tr.I 41, Tr.III 221-227. The jurors, nevertheless, took approximately twenty-five minutes to convict Shannon of sexually exploiting a child over thirty years his junior. Tr.III 235.

Shannon's § 2255 petition seeks to reopen the same failed defense.

## A.  The Evidence at Trial

When he was eight years old, John Doe 1[5] met Shawn Shannon. Tr. II 159.  The two began spending more time together when John Doe 1 was twelve years old. *Id.* John Doe 1 was not close to his own father and needed a positive male role model. Tr.I 47; Tr.II 8, 17. Valerie Shields, John Doe 1's mother, hoped Shannon, then forty-five years old, could fill that void in her vulnerable young son's life. Tr.II 14-15; PSR at 2.

By the time John Doe 1 was thirteen, Shannon began spending an inordinate amount of time and attention on this middle-schooler. Tr.I 48; Tr.II 209.  Shannon groomed John Doe 1 (and his family) through buying the boy gifts (like a new iPhone, an X-Bbox, and clothing) and participating in "teenage" activities and interests (like "Disney shows"). *Id.*; Tr.II 7, 176-78; Ex. 2V.  Shannon gave John Doe 1 "100 per cent"; he was the minor's "confidant", "best friend", and "father figure." Tr.II 8-9, 17, 184; Tr.I 48.

---

[5] As a child witness, John Doe 1 is entitled to privacy protections restricting disclosure of his identity in public documents.  18 U.S.C. § 3509(d).

3

Ms. Shields trusted Shannon because he "talked in a Christian way" and he was a like a member of their family. Tr.II 5, 14-15. The church was very important to John Doe 1 and Ms. Shields relied on Shannon to provide her son with appropriate guidance. Tr. II 17.  Instead, when John Doe 1 would get into disagreements with his parents, Shannon would always take John Doe 1's side. Tr.II 173. Shannon even discussed how he would adopt John Doe 1 if social welfare services intervened in their family. Tr. II 178-81; Ex. 2C. After discovering Shannon's betrayal, Ms. Shields felt like a "complete failure" for having trusted Shannon with her son's life. Tr.II 22.

John Doe 1 and Shannon sent text messages to each other all day, every day.  Tr. II 10-11, 164. Over 7,600 text messages with Shannon were extracted from John Doe 1's iPhone 5c. Tr. II 54; Ex. 2. These messages were exchanged between late January 2015 and March 17, 2015. *Id*. Many of those text messages turned to sexual banter, with Shannon discussing his interest in anal sex, masturbation, and watching pornography. Tr. II 182, 189, 201; Ex.2F. The two texted the secret code "P" when someone else was nearby, so that Shannon would know not to text sexually charged messages anymore. Tr.II 205. John Doe 1 testified it made him feel awkward and uncomfortable each time Shannon discussed sexual acts he wanted to do with John Doe 1. Tr.II 173, 195.

John Doe 1's family wasn't wealthy. Tr. II 10-11. So Shannon's gifts were important to him, such that he felt pressure to comply with Shannon's sexual requests; he felt he owed Shannon something. Tr.II 210-11, 214-215, 216; Tr.III 18; Ex. 2E, 2I.

On February 28, 2015, Shannon prepared to travel to Decatur, Illinois, and spend the night in a hotel with John Doe 1. Ex. 2Q. (text message from Shannon to victim: "what I

am most excited for, seeing you and hang [sic] out with you, or seeing your dick and how much it has grown"). In text messages deleted, but recovered from Shannon's iPhone 5s, as well as the victim's iPhone 5c, Shannon clearly described his nefarious intentions with the victim. Ex. 2R, 15A (text messages from Shannon to victim: "so if we get a room, then I want to go swimming. then we can go to room. and get naked. from there we can play with the toys. and no clothes till Sunday morning."… "now, can I bring the small anal toys?  you want to try one? "…"and we'll take some good pics with good poses for you to give to people."…"I have bowling ball, but may not need it. I'll pack laptop later tonight. I have your new toy and thing of lube. I have my anal toys and my open bottle of lube. and two condoms…") Shannon prepared for this sexual rendezvous with a 13 year old, by dyeing his hair, normally gray to brown to appear younger. PSR ¶256, Ex. 2R.

Despite the defendant's contention that someone, unbeknownst to him, accessed his device and sent thousands of text messages remotely to frame him over the course of several months, the evidence showed that each of these text messages was traceable through his cell phone provider to a cell site tower location where the messages originated, specifically Liberty Corners, Muncie, Indiana, where the defendant's residence was located. Ex. 17A, 17B. Forensic examiner Johnathan Bridbord from the Department of Justice's Criminal Division, Child Exploitation and Obscenity Section, married the evidence located on the victim's iPhone 5c, Shannon's iPhone 5s, and evidence obtained from Apple servers, as well as cell site location data from AT&T. Tr.III 107. Mr. Bridbord compared text messages extracted from the victim's iPhone 5c to the

text messages deleted from Shannon's iPhone 5s and found they matched. Mr. Bridbord further testified that cell site location data showed that the text messages from Shannon's phone to John Doe 1's phone were sent from the vicinity of Shannon's residence in Muncie, Indiana. Tr.III 108-111.

This cell site location data and text messages themselves also traced Shannon's travel from Muncie, Indiana, across Central Illinois to Decatur, Illinois, and the Ramada Inn to meet John Doe 1. Ex. 17A, 17B, 2S (text message from Shannon to victim: "almost at shell" at 3:08 p.m. CST on Saturday, February 28, 2015, cell site location, near Cisco, Illinois[6]). The hotel registration receipt exhibited Shannon's name and signature, but included a fake address in Dallas, Texas. Ex. 7. The hotel registration receipt also included a reference to Shannon's black GMC Sierra that he boasted about to the victim. Ex. 2Z.

Agents matched the background and bedding of the sexually explicit images of John Doe 1 to the exact hotel room at the Ramada Inn where Shannon stayed. Ex. 5B. While at the Ramada Inn, Shannon sexually exploited the minor victim, and may have sexually assaulted him, by digitally penetrating the minor's anus. Tr.III 11-12; Ex. 3A-3S, 2T ("so you didn't tell [your mom] I fingered you lmao jk"…"I'll be honest I think I put my finger in before I realized I had done it, then it was like oh well I am there now lol"). After watching pornography on Shannon's laptop and masturbating together, Shannon stored

---

[6] Cisco, Illinois is a distance of approximately 21 miles, via U.S. Interstate 72, from Decatur, Illinois. Google Maps https://www.google.com/maps/dir/Cisco,+Illinois/Decatur,_+Illinois /@39.9293177,88.9818201,11z/am=t/data=!3m1!4b1!4m14!4m13!1m5!1m1!1s0x880cab7648a8eb7 3:0x6e9ae9f58b68bb5f!2m2!1d88.7261827!2d40.0114248!1m5!1m1!1s0x8874ae4bee0c1da7:0x70b47 1ab67a3830!2m2!1d-88.9548001!2d39.8403147!3e0 (last visited February 10, 2019).

the images of John Doe 1 on a password-protected application, VS2, which was inaccessible on the phone's normal photo storage. Tr.II 69-70; Tr.III 17.

The testimony of the expert forensic examiner also corroborated the victim's testimony that these sexually explicit images were taken with Shannon's iPhone 5s (as opposed to John Doe 1's iPhone 5c[7]) at about midnight on February 28, 2015/March 1, 2015. Ex. 3T-1; Tr.II 77. That iPhone 5s was seized from the defendant's presence on the day law enforcement searched his residence. Tr. II 77; Ex. 14B. The jury heard forensic expert testimony that in addition to deleting text messages and contacts from his device, Shannon also deleted the application program VS2 that had securely stored the pornographic images of the minor. Tr. III 135. The forensic examination, however, revealed log entries on Shannon's iPhone 5s, that Shannon could not delete, which showed he last accessed the VS2 application at about the time he distributed child pornography on March 14, 2015. Ex. 16F. The forensic examiner also located forensic evidence that the pornographic images of John Doe 1 were once on Shannon's iPhone 5s, even if they were deleted by the time law enforcement seized the device. Further metadata from the images showed that they were taken with the back camera on the iPhone 5s, not the front camera used to take images of oneself or "selfies." Ex. 3T-2; Tr. II 78.

---

[7] Contrary to Shannon's theory that John Doe 1 took the images himself, in addition to the metadata embedded in the images themselves proving that they were taken with an iPhone 5s, John Doe 1's iPhone 5c was visible in many of the images, proving, even to a lay person, that John Doe 1 didn't take the images himself. Tr. III 14; Ex. 3L, 3M, 3N.

On March 14, 2015, Shannon distributed pornographic images via text message that depicted John Doe 1 from another incident where Shannon directed the victim to engage in sexually explicit conduct and captured images of that conduct. Tr.III 21-23;  Ex. 4A, 4B, 4C, 2W. Agents examined the bedding in the background of these images and found that it matched the bedding in Shannon's bedroom. Ex. 6A-6E. During this earlier incident in Shannon's bedroom, Shannon again took the sexually explicit images of John Doe 1 on Shannon's iPhone 5s, he masturbated with the victim, and when the victim ejaculated, Shannon "ate" his semen. Tr.III 23. The cell site location for the origination of these text messages was also in Liberty Corners, Muncie, Indiana, consistent with the location of the defendant's residence. Ex. 17A, 17B.

When caught by the victim's mother and confronted, Shannon admitted his crimes and attempted to rationalize his behavior, while blaming the victim. Ex. 15A (text message from Shannon to Dustin Bradshaw: "he asked me to take for his girlfriend at the time."), Ex. 1A, 1B, 1C (text message from Shannon to Ms. Shields: "hey, Dustin just told me. I am sorry about taking pictures for [John Doe 1]. He asked […]I thought of him as an adult"). Again, the cell site location for these admissions was in Liberty Corners, Muncie, Indiana. Ex. 17A, 17B.  Notably, Ms. Shields had a Samsung phone, which functions in the Android (as opposed to Apple) operating system. Tr.II 31. Therefore, the apologetic messages sent to her phone were SMS messages (as opposed to iMessages), and when married with the cell site data from AT&T, they show that Shannon was at his residence in Muncie, Indiana, when he confessed to these crimes. The jury saw the text messages to Ms. Shields, which were captured by a Decatur Police officer on the day she

reported the crimes to them.  Ex. 1A, 1B, 1C.  The jury saw forensic artifacts recovered from Shannon's iPhone 5s, that showed these SMS messages were deleted from this phone:

| 10 | SMS Messages | | | | 3/17/2015 4:34:59 PM(UTC-4) | +1217 ████ Valerie Shields | Source file: Shawn's iPhone/Library/Mail/Recents : 0x25316 (Table: recents, contacts, Size: 1380352 bytes) |
|---|---|---|---|---|---|---|---|
| 11 | SMS Messages | | | | 3/17/2015 6:08:44 PM(UTC-4) | +1217 ████ Valerie Shields | Source file: Shawn's iPhone/Library/Mail/Recents : 0x25308 (Table: recents, contacts, Size: 1380352 bytes) |

Ex. 15A

And the jury saw the AT&T records for these calls from which the forensic examiner mapped the cell site location to the vicinity of Shannon's residence:



Ex. 17A[8]

---

[8]  Ex 15A is in Central Daylight Time (UTC-4), while Ex. 17A is in Universal Time Coordinated (UTC).

Shortly after sending these apology messages to Ms. Shields, Shannon began deleting evidence on his iPhone, including thousands of messages with contact information for the minor victim. Tr. II 11. Tr. II 127-128.

Further forensic expert testimony refuted Shannon's claim that someone else remotely accessed his device and impersonated or framed him, without his knowledge. The forensic examiner testified that any time a new device uses an Apple ID registered to another device a notification is sent to the user of the original device. Tr. III 141. In addition, a log entry is made on the original device to document such notification. *Id*. The jury heard that no log entries were found on Shannon's iPhone 5s to indicate that any other device remotely logged into his Apple ID. *Id*.  Notwithstanding Shannon's theory of the case, neither forensic examiner found evidence that anyone other than Shannon committed the crimes against John Doe 1. Tr. II 155; Tr.III 150.

Finally, to refute Shannon's defense that someone else had hacked into his Apple account and committed these crimes, the United States presented evidence, recovered from another older iPhone (model 3) seized from Shannon's residence. This device contained text messages and images involving another minor victim to whom Shannon sent pornographic images of himself, including full-body images.  Ex. 12A-12H; Ex 13A-13K. Shannon enticed and coerced this minor into producing child pornography and engaged in abusive sexual contact with this minor. Tr.III 41-59; Ex. 13A-13K.

## B.  Shannon's sentencing

On September 11, 2017, Shannon was sentenced to 720 months imprisonment, which constituted a ninety percent downward departure from the guidelines range (advising a

life sentence, or 7080 months imprisonment). D.E. 9/11/2017[9]; R.112; R.114. Shannon was represented by Assistant Federal Defender Elisabeth R. Pollock at sentencing.

### C.  Shannon's Post Trial Proceedings

Shannon did not appeal his conviction and sentence. When a prisoner does not take a direct appeal from his conviction, the conviction becomes final when the time for filing a notice of appeal expires. *Clay v. United States,* 537 U.S. 522, 525 (2003); *United States v. Woods,* 169 F.3d 1077, 1078 (7th Cir.1999); *Sanchez-Castellano v. United States*, 358 F.3d 424, 428 (6th Cir. 2004). Therefore, his judgment became final on September 27, 2017. 28 U.S.C. § 2255(f); Fed. R. App. P. 4(b)(1)(A).

Shannon filed a timely motion to vacate his judgment and sentence pursuant to 28 U.S.C. § 2255. R.II 1, R.II 4. Shannon moved, unopposed, to supplement his motion R.II 5, 7. And further moved to amend his pleading to include additional claims. R.II 11,R.II 12.  This Court granted Shannon's motion to supplement and amend his petition.  D.E. 11/13/2018; 12/6/2018. The United States was ordered to respond by February 26, 2019.

### D.  The Government's Disclosure of the Court's Email Message

On September 19, 2018, the U.S. Attorney's Office disclosed to defendant, via counsel, an email exchange between Paralegal Specialist Staci Klayer and United States District Judge Colin S. Bruce.[10] In this email string (April 1-4, 2017), a probation officer informed

---

[9] Judgment entered 9/13/2017. R. 112.

[10] In December 2016, Judge Bruce and an employee of the U.S. Attorney's Office for the Central District of Illinois, who was not a member of the prosecution team and whose office was located outside the Urbana branch office, communicated by email during and concerning the trial in *United States v. Nixon*, Case No. 15-cr-20057. The U.S. Attorney's Office subsequently conducted a search of its email archives for any email sent to or received from Judge Bruce or his chambers' email account, in order to examine those emails for potential ex parte communications, and

a number of addressees—including Judge Bruce, Urbana Branch Supervisor AUSA Eugene Miller, Ms. Klayer, clerk's office personnel, the magistrate judge, and another district court judge—that the probation office would be unavailable for hearings on September 11 and 12, 2017. Judge Bruce, replying to all of the addressees, stated, "Shawn Shannon re-sentencing set for September 11. Nice."  Bates No. 2690, 2691 (duplicate emails).  Ms. Klayer then replied solely to Judge Bruce, writing, "Sounds like the probation officer assigned to this case needs to stay here and work," and Judge Bruce responded, "Yep. Don't think its [sic] moving……" *Id.* at 2692-94.

### E.  Shannon's § 2255 Motion

Shannon's motion raises three claims. The first is that his trial counsel was ineffective. Under the ineffective assistance of counsel umbrella, Shannon lists ten separate alleged deficiencies, which are grouped generally as follows:

1.    Trial counsel failed to present witnesses to address Shannon's alternative suspect theory. Pet.Br. 7-8, 12-13.

2.    Trial counsel failed to use the government's forensic experts to advance his theory of the case. Pet.Br.9-11.

3.    Trial counsel failed to meaningfully object to the introduction of other act evidence. Pet.Br. 13-15.

---

disclosed any such emails to the attorneys of record for those cases. That search led to the disclosure of the email pertinent to this case. At Shannon's counsel's request, the government also provided him with additional emails that involved Judge Bruce and one or more members of the USAO.

4.      Trial counsel was ineffective in failing to meaningfully file a motion for new trial, pursuant to R.Crim.P. 33.[11]

Shannon's motion should be denied for the reasons discussed herein.

## II.     Legal Framework

A petitioner may avail himself of Section 2255 relief only if he can show that his sentence was imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. *Swanson v. United States*, 692 F.3d at 714. Section 2255 is limited to correcting errors that "vitiate the sentencing court's jurisdiction or are otherwise of constitutional magnitude." *Guinan v. United States*, 6 F.3d 468, 470 (7th Cir. 1993), *citing Scott v. United States*, 997 F.2d 340 (7th Cir. 1993).

If an error is neither jurisdictional nor constitutional, in order to be cognizable on collateral review, it must present "exceptional circumstances" in which a fundamental defect inherently results in a complete miscarriage of justice. *Hawkins v. United States*, 706 F.3d 820, 829 (7th Cir. 2013), citing *Hill v. United States,* 368 U.S. 424, 428 (1962).

---

[11] Shannon also makes a superfluous comment about trial counsel's deficient preparation for the sentencing hearing. Pet.Br.17. Trial counsel withdrew prior to the sentencing hearing based on the breakdown in their relationship and the Federal Public Defender was appointed. D.E. 3/31/2017. Since Shannon does not allege any error, based on counsel's performance at the sentencing hearing, he can allege no prejudice based on what trial counsel may or may not have prepared, at a sentencing hearing that trial counsel ultimately did not handle.

III.   **Argument**

All of Shannon's arguments claiming trial counsel's alleged deficiencies do not meet the legal standard necessary to warrant any remedy. Shannon first fails to meet the threshold inquiry that trial counsel's performance was "objectively deficient" and that counsel's strategic decisions fell below a "wide range of competent representation." *Swanson v. United States*, 692 F.3d 708, 714 (7th Cir. 2012) (internal quotation marks omitted). Further, Shannon fails to show that but for trial counsel's subpar representation, Shannon's outcome would have been different. *Id*.

Shannon's second claim argues that the interest of justice requires a new trial because United States District Judge Colin S. Bruce allegedly had a disqualifying bias against him and in favor of the prosecution. His argument is based primarily on his interpretation of a single e-mail exchange between Judge Bruce and a paralegal five months prior to the Shannon's sentencing, as well as his interpretations of other e-mails that did not pertain to this case sent at other times by Judge Bruce to certain former colleagues at the U.S. Attorney's Office. A fair reading of these e-mails in context does not support Shannon's conclusion that Judge Bruce was biased against the defendant in favor of the prosecution.

Although a number of the judge's communications at issue were ex parte, they do not constitute a violation of Shannon's due-process rights. The Supreme Court has held that the Due Process Clause of the Fifth Amendment requires a fair trial before a judge with no actual bias against the defendant or with no interest in the outcome of a litigant's case. The Seventh Circuit has held that litigants are not denied due process by either the appearance of partiality or by circumstances that might lead one to speculate as to a

14

judge's impartiality. Rather, the presumption is that judges are able to rise above any biases and biasing influences. Thus, to prove a disqualifying bias warranting a new criminal trial, the defendant, or petitioner in this context, must establish direct evidence of bias -- actual bias -- or a possible temptation on the part of the judge so severe that a reviewing court presumes an actual, substantial incentive for the judge to be biased -- presumptive bias. This Shannon cannot do.

With respect to the single ex parte e-mail exchange with a paralegal in the instant case, the content and context of the communication do not demonstrate, under the undisputed facts of this case, that the judge had a temptation so severe that a reviewing court might presume a disqualifying bias on his part. Indeed, the even-handed manner in which the judge ruled in favor of, and against, both parties before, during, and after Shannon's trial (including the substantial downward departure Judge Bruce afforded Shannon at sentencing) is further evidence that demonstrates the judge did not have a disqualifying bias that entitles Shannon to a new trial. No prejudice can be established here.

Furthermore, the additional ex parte communications at issue may have been improper, but they do not and cannot rise to the level of a due-process violation warranting the extraordinary remedy of a new jury trial. Therefore, the interest of justice does not require a new trial.

Finally, Shannon alternatively argues that the government violated the Rules of Professional Conduct when it failed to report the judge's ex parte communications immediately after they occurred.  Even if imputed violations of the Rules of Professional Conduct occurred here, violations of ethics rules do not automatically translate into due-

process violations warranting a new jury trial in a criminal case. Shannon cannot avoid the requirement that he prove a disqualifying bias by attempting to recast his argument in terms of an alleged government violation of the Rules of Professional Conduct. It is without dispute that the government's actions or inactions regarding the ex parte communications did not in any way affect the jury's verdict in Shannon's case.

Shannon's motion should be denied.

### A.     Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel may be brought in a Section 2255 motion. To prevail on such a claim, however, a petitioner must show that his attorney's performance was objectively unreasonable and that such performance prejudiced the petitioner. *See, e.g., Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The courts, however, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 446 U.S. at 690. The court's examination of an ineffectiveness of counsel claim is "'highly deferential' to counsel, presuming reasonable judgment and declining to second guess strategic choices." *Valenzuela v. United States,* 264 F.3d 694, 698 (7th Cir. 2001), quoting *Strickland*, 466 U.S. at 689).

In order to determine whether the defendant has met the performance prong of *Strickland*, we "consider the reasonableness of counsel's conduct in the context of the case as a whole, viewed at the time of the conduct, and there is a strong presumption that any decisions by counsel fall within a wide range of reasonable trial strategies." *Id.*, citing *United States v. Lindsay*, 157 F.3d 532, 535 (7th Cir.1998).

With respect to the prejudice prong, the defendant must "be able to demonstrate that the complained of deficiency resulted in . . . [a] 'reasonable probability' that in the absence of error the result of the proceedings would have been different, and [that the proceeding] was fundamentally unfair or unreliable." *Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). Absent a sufficient showing of both error and prejudice, a petitioner's claim must fail. *United States v. Delgado*, 936 F.2d 303, 311 (7th Cir. 1991).

It "is the rare exception, not the general rule" for a petitioner to have a valid ineffective assistance of counsel claim requiring the granting of a Section 2255. *Marrero v. United States,* 2007 WL 914313 *1 (N.D.Ill. March 21, 2007); *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996). Furthermore, relief under Section 2255 is an extraordinary remedy "because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) *citing Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006).

### 1. The proffered testimony of Shannon's witnesses would not have changed the outcome of the trial

Defense counsel had valid strategic reasons for not calling Shannon's parents and friends to testify, which this Court should not second guess, despite Shannon's suggestion that counsel's failure to do so constituted ineffective assistance. "The Constitution does not oblige counsel to present each and every witness that is suggested to him." *Blackmon v. Williams*, 823 F.3d 1088, 1103 (7th Cir. 2016) (internal quotation omitted). "Rather, counsel need only investigate possible lines of defense and make an

informed decision." *Id.* "If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005). Strategic decisions like these, so long as they are made after a thorough investigation of law and facts, are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

The record is clear that trial counsel contemplated, but ultimately decided against, calling several witnesses at this trial. R.33; Tr.I 6-7, 89.  Specifically, trial counsel made an informed decision not call Dean Jones, Sarah Jones, Adam Unger, Dave Jones, Dee Topper, James Shannon, Wilma Shannon, Chris Shannon, and Stacey Shannon. *Id.*

### a. Wilma and James Shannon

Wilma and James Shannon are petitioner Shawn Shannon's parents and their testimony is fraught with inherent bias and their motive to protect their son. *See Bergmann v. McCaughtry,* 65 F.3d 1372, 1380 (7th Cir.1995); *United States v. Curtis,* 742 F.2d 1070, 1074–75 (7th Cir.1984) (finding that a family member's bias in testifying would be readily apparent to a jury and outweigh its value). Mrs. Shannon's proffered testimony includes information about Dustin Bradshaw's mother's cancer treatment, John Doe 1's "weird behavior" in December 2014, and an alleged dispute between Bradshaw and Shannon over "stolen equipment." Pet. Ex. A. Mr. Shannon's proffered testimony includes the cancer treatment of Bradshaw's mother, his observations of John Doe 1's mental health and diagnosis, the dispute with Bradshaw over the "stolen equipment", and his account of the events on February 28, 2015 and March 1, 2015.  Pet. Ex. D. Both Mr. and Mrs. Shannon state in their declarations that they expected to be called to testify, none of their proffered statements, however, would have materially changed the outcome of the trial.

18

First, defense counsel would have had legitimate concerns about Mr. and Mrs. Shannon's credibility when weighing whether to call them as witnesses. Notably, Mr. and Mrs. Shannon had presented defense counsel with a fraudulent letter, purportedly sent to them from John Doe 1, wherein he apologizes for falsely accusing Shannon. The letter was replete with factual inconsistencies, and Shannon could not establish its authenticity. R. 41. Defense counsel chose not to present this document at trial and his receipt of it could have raised questions regarding these witnesses' integrity.

Second, Mrs. Shannon was a volatile witness that would have been difficult for defense counsel to control and keep her testimony within legal boundaries. The government submitted several jail calls wherein Mrs. Shannon promised to disregard defense counsel's advice and defy the Court's admonitions. R. 60. For example, in a call between Shannon and Mrs. Shannon on January 22, 2016, at 21:21, Mrs. Shannon vows to testify about John Doe 1 and his mother's medical history, despite acknowledging that the government will object:

> WILMA SHANNON:[12] Put me on the stand, you can bet your bottom dollar that somewhere in my testimony I will tell that.
>
> SHAWN SHANNON: Oh, I will too.
>
> WILMA SHANNON: Even if they stop --
>
> SHAWN SHANNON: I mean, all they'll do is say --
>
> WILMA SHANNON: Even if they --

---

[12] The transcript identifies Wilma Shannon as "Female Caller" and Shawn Shannon as "Male Caller", however the government would have authenticated their voices through agent testimony if these calls were played at trial.

19

SHAWN SHANNON: I -- objection.

R. 60 at 12-13

Further in that same call, Mrs. Shannon conspires with her son that she will testify to evidence that she knew was prohibited under the rape shield statute, and which the Court had already ruled, correctly, was inadmissible. *Id.*; *See* R. 34 (order denying Shannon's motion to Introduce Evidence under F.R.Evid 412).  Mrs. Shannon promises she "will get that out. And all it takes is …getting it out even if they object it, the jury will hear it." *Id.*

In another call, a few months later, on April 9, 2016, at 19:14, Mrs. Shannon conspires with her son to testify on additional topics that she knew were inadmissible, such as the victim's character:

> WILMA SHANNON: But here's the thing, when he puts me on the stand and everything, and ask of me, you know, he'll have to ask me how I, I, I know [John Doe 1] and what did I think of him, or whatever or all this and that.
>
> SHAWN SHANNON: They won't ask you about --
>
> WILMA SHANNON: Then I can --
>
> SHAWN SHANNON: -- his character. We're not allowed to talk about it.
>
> WILMA SHANNON: But I --
>
> SHAWN SHANNON: We, we can slip it in.

*Id.* at 4.

If Mrs. Shannon decided to "slip" in inadmissible evidence, she could have affected the trial in a detrimental way; she could have caused a mistrial, been held in contempt, or opened the door to the admissibility of further damaging evidence against Shannon. To the extent that Mr. or  Mrs. Shannon intended to testify to any medical or mental health

treatment received by any witness, the relevancy of such testimony is very low, while the danger of confusion of the issues and unfair prejudice to the witness is high. Fed.R.Evid. 403.

Further, Mr. and Mrs. Shannon lacked the foundation to testify to any medical or mental health treatment a witness received, as their information was likely based on inadmissible hearsay. It is also unclear from their declarations when these witnesses would have received such treatment, and what impact, if any, such treatment would have on the witnesses' ability to accurately recall events that occurred with Shannon. While defense counsel could have possibly cross-examined the witness about his or her own mental or medical treatment, the government would have strenuously objected. The Court could and should have restricted the cross examination of a witness, particularly a minor victim, that was intended only to harass, humiliate and embarrass the witness or victim. *Delaware v. Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435; 18 U.S.C. § 3771(a)(8) and (b)(1)(the Crime Victims' Rights Act requires that the court "ensure that the crime victim is afforded" the right to be "treated with fairness and with respect for the victim's dignity and privacy.")  At bottom, Shannon does not advance any permissible legal or factual theory in offering this proffered testimony, other than to harass, humiliate, or embarrass the victim. It is unlikely that any court would have allowed such testimony, and even less likely that this testimony would have swayed a jury to overlook the overwhelming evidence the government presented to corroborate each critical aspect of the victim's testimony.

Moreover, both Mr. and Mrs. Shannon's declarations are internally inconsistent, indicative of their lack of credibility as witnesses. They claim to have discussed the Apple iMessage technology with defense counsel. Pet.Ex.A at 3; Pet.Ex.D. at 3. But the exhibits they attach to their declarations show that they gathered this information in February 2017, seven months after the trial. Pet.Ex. 4-5.

Finally, Mrs. and Mr. Shannon's proffered testimony claiming that a tangential dispute between Dustin Bradshaw and Shannon was the motivation for Bradshaw to engage in an elaborate conspiracy, in which he recruited several law enforcement agencies, Apple Corporation, and AT&T, to frame Shannon is nonsensical. This theory is so far-fetched that it was unlikely to gain any traction, and would instead have caused confusion of the issues, wasted the jury's time, and had little probative value. Fed.R.Evid. 403. Bradshaw, a married father of two small children, who lives and works full-time in Decatur, Illinois, was three hours and forty-five minutes away from Muncie, Indiana, where the text messages were repeatedly sent from Shannon's iPhone 5s to John Doe 1. Tr.III 68; https://www.mapquest.com/directions/from/us/il/Decatur/to/us/in/muncie-282039872 (last visited, February 18, 2019). Bradshaw testified that his iPad shared music with Shannon's Apple account, but nothing else, and that he never used it to send text messages. Tr.III 95. Further, forensic evidence confirmed that the sexually explicit images of John Doe 1 were taken with an iPhone 5s, not an iPad; therefore, even if Bradshaw could abandon his family and job to drive back and forth from Decatur to Muncie, to send and receive 7,000 sexually charged messages to a tween boy, he could

not have taken the explicit pictures of the minor on February 28, 2015, at the Ramada, Inn that are the subject of counts one through nineteen of the indictment.

Mr. Shannon offered one more item of proffered testimony. Mr. Shannon claims that he travelled with Shannon to Decatur on February 28, 2015, and stayed the night with John Doe 1 and Shannon in the Ramada Inn, but did not see Shannon take sexually explicit pictures of the minor. Pet. Ex. D at 3-5. Mr. Shannon offers this testimony forty-one months after his son was arrested for these crimes. "[I]f potential witnesses are not called, it is incumbent on the petitioner to explain their absence and to demonstrate, with some precision, the content of the testimony they would have given at trial." *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987). To meet this burden, "the petition must be accompanied with a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions." *Prewitt v. United States*, 83 F.3d 812, 819 (7th Cir. 1996). Mr. Shannon sat on his hands throughout the entire investigation and the three-day trial, never once claiming that he was an eye witness at the Ramada Inn when the crimes occurred. Tr.I 13. Putting aside the complete lack of corroboration that anyone saw Mr. Shannon in Decatur that day (Tr.I 49-51), and that this bizarre revelation was kept secret for over three years, Mr. Shannon's potential testimony lacks credibility. While Mr. Shannon claims he "expected" to testify, the Court made it very clear that any witness who remained in the courtroom throughout the trial would "not be testifying." Tr.I 8. On information and belief, Mr. Shannon sat through the entirety of the trial and was present for the Court's admonition. Tr.I 13. By his own conduct, Mr. Shannon took himself "off the witness list." Tr.I 8 Finally,

according to defense counsel's affidavit, Mr. Shannon never told him that he was in the hotel room when the crimes occurred. Declaration of Kevin Bolger, Gov.App. 138. Mr. Shannon's proffered declaration is unsupported by the record.

Given the problems with their testimonies and their minimal probative value, defense counsel did not err in failing to call Wilma and James Shannon.

### b.    Dee Topper

Shannon offers a declaration by Dee Topper regarding a tangential issue about changing the name of a singing event. Pet. Ex. B. Shannon argues that this hearsay testimony equates to motivation for Bradshaw to "eliminate the Shannons and take over their events." Pet. Br. 8. First, assuming trial counsel could prevail against a hearsay objection in admitting Ms. Topper's testimony at all, Bradshaw's alleged motive to change the name of their gospel singing group event is wholly immaterial to whether Shannon sexually exploited a minor in February 2015 and distributed child pornography in March 2015. The idea that Bradshaw would fabricate an elaborate conspiracy to frame Shannon for multiple child exploitation crimes because he wanted to rename a gospel singing event is absurd.

Further, it is unclear if Ms. Topper would have been available for the July 2016 trial. Ms. Topper was subpoenaed to an earlier hearing in May 2016 and refused to attend, submitting instead a note from her physician declaring that she was unable to travel. *See* letter from Topper's physician, dated June 2, 2016, Gov. App. 140. Even if she was well enough to travel by the July 2016 trial, defense counsel would have valid strategic reasons for not calling her, not only because her proffered testimony was irrelevant, but also

24

because her motivations would have been subject to strenuous cross examination since she refused to cooperate with government investigators initially.

   c.   **Logan Richardson**

Shannon offers a declaration of Apple technician Logan Richardon regarding his opinion as to Shannon's mental state, which is inadmissible. F.R.Evid. 704(b). He also suggests Bradshaw was an alternative suspect for these crimes. But Richardson is not a forensic examiner and does not offer any opinion about the forensic artifacts located on Shannon's iPhone 5s linking him to the text messages and the explicit images. Richardson also ignores the cell site location data that puts the iPhone 5s in the vicinity of Shannon's home when the messages were sent. Further, Richardson does not address the forensic data embedded in images themselves, specifically that they were taken with an iPhone 5s, using the back camera, at about midnight on February 28, 2015, but deleted from Shannon's iPhone 5s.  Finally, even if Richardson's testimony explaining the difference between iMessages and SMS messages would be been minimally helpful to the jury, although cumulative, Richardson could not have refuted the fact that Shannon's confession to Ms. Shields was sent not via iMessage, but by SMS message, and that the cell site location data placed the phone in the vicinity of Shannon's residence. Because there was minimal probative or other value to Richardson's testimony, defense counsel did not err in not calling this witness.

Mr. Richardson's declaration also references his review of an AT&T bill for John Doe 1 and Shannon's cellular service from February 28, 2015, through March 1, 2015, which was noted, but not included in Pet.Ex. 6. This exhibit is actually an email from Stacy

Shannon, who did not submitted a declaration of proffered testimony, interpreting Shannon's phone bill. Pet.Ex. 6. It is unclear how Shannon intended to introduce this exhibit since Mr. Richardson did not offer any testimony explaining its relevance to his opinion and Shannon did not provide the actual records for this Court's review. Putting aside Shannon's inability to lay the foundation for these mystery telephone records, or Stacy Shannon's interpretation of them, Shannon argues that these records prove that John Doe 1 engaged in an active text conversation (144 messages) during a four hour time span on the evening of February 28, 2015, with someone other than Shannon. Per.Br. at 13. This purported evidence undoubtedly confirms that John Doe 1 is a young person with a cell phone. This evidence further corroborates, rather than contradicts, John Doe 1's testimony that he and Shannon were in the same room together all night since all (or most) of the text messages were to someone other than Shannon.

Shannon alleges that trial counsel failed to investigate Apple technology, bolstered the government's expert testimony, and failed to call an expert of his own. However, trial counsel did not need to call an expert witness to explain how Apple iMessages work because there was no evidence that any device other than Shannon's sent the messages in this case. Further, while the text messages provided strong evidence of Shannon's identity and motive for the sexual exploitation of John Doe 1, the evidence of the crimes were the images themselves, which were taken with an iPhone 5s, not Bradshaw's iPad. Trial counsel has no obligation to add testimony that would not be helpful to his client's defense. *United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir.1990).  Finally, while trial counsel made off handed comments about the expertise of the government's witnesses,

these experts had been qualified in state and federal courts numerous times. Tr.II 42-47; Tr.III 95-101. Counsel's comments were harmless and could have been a strategic tactic to align himself with the jury and gaining some credibility for his client.

While diligence is required in investigating a client's case, counsel need not "track down every lead or ... personally investigate every evidentiary possibility before choosing a defense and developing it." *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir.1987). Such tactics would not necessarily improve a case, and "a lawyer's decision to call or not call a witness is a strategic decision generally not subject to review." *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir.1997); *accord Valenzuela v. United States*, 261 F.3d 694 (7th Cir.2001). "The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record." *Balzano*, 916 F.2d at 1294. This is particularly true here when none of the proffered witnesses could have refuted some of the most incriminatory evidence in this case – (1) the sexually explicit images themselves were unquestionably not self-taken, (2) they were taken with an iPhone 5s, (3) then deleted from Shannon's device after he confessed to the victim's mom, (4) there was no evidence found that other devices were cross-designated to use Shannon's Apple ID, and (5) the phone was physically located near Shannon's residence when the he sent many of the sexually charged messages, and specifically his SMS confession/apology to the victim's mother after getting caught. Mr. Richardson's proffered testimony actually supports the government's evidence as to this final point regarding the SMS message to

27

the victim's mother.   Pet.Ex.C at 3 ("Text messages, however, are only sent from the phone number associated with the device, and that cannot be copied or eliminated from a device connected to the phone number without intervention from the cellular company being used.").

Finally, trial counsel's proffered explanation is reasonable and consistent with valid trial strategy reasons that this Court should not reassess. Declaration of Kevin Bolger, Gov. App. 138 ("their testimony would either not have any relevance to the defense's theory of the case, were inadmissible under the rules of evidence, would have suborned perjury or would have opened a line of question by the prosecution that would have been detrimental to my client."). *Strickland*, 466 U.S. at 690; *Williams,* 106 F.3d at 1367.

### 2. John Doe 2's testimony was properly admitted, regardless of how strenuously trial counsel could have objected

Shannon's defense permitted the admission of his prior conduct with John Doe 2 because he advanced a defense that he was framed and did not engage in sexually explicit conduct with John Doe 1. *United States v. Sebolt*, 460 F.3d 910 (7th Cir. 2006) (affirming the admissibility of the defendant's statement through chat logs that he sexually molested a young male relative in the past to show motive and identity.)  Shannon claims that the footnote in the Court's order permitting the introduction of other acts evidence regarding trial counsel's failure to advance a "meaningful response" implied that the Court admitted this evidence in error.   Pet.Br. 14. Shannon misstates the Court's order. The Court's order regarding trial counsel's argument was made in reference to the other acts evidence involving John Doe 1, not John Doe 2, which Shannon does not challenge here.

R. 26 at 7. Further even if trial counsel did not draft a comprehensive pleading objecting to the admission of this evidence, the order demonstrates that the Court weighed the evidence and correctly decided it was admissible to show Shannon's motive, intent, knowledge, and identity – all of which he challenged at trial. R. 26 at 9-12. In this case, the probative value of John Doe 2's testimony outweighed any prejudicial effect based on the nature of Shannon's defense. The conduct with John Doe 2 not only mirrored the charged conduct, but corroborated Shannon's sexual interest in minors and his motivation for producing sexually exploitive images of John Doe 1.

Manifestly, when given the opportunity to challenge the legality of the Court's ruling on the admissibility of this evidence, Shannon chose not to appeal, but instead frames this issue under the § 2255 umbrella, claiming trial counsel's motion objecting to this evidence was a "serious error" warranting a new trial. If the error was so blatantly and objectively serious, Shannon could have and should have raised the inadmissibility of John Doe 2's testimony on direct appeal, but did not.

Finally, Shannon argues that because he allegedly believed John Doe 2 was eighteen, this prior incident could not be considered as a prior instance of sexual misconduct with a child. Pet.Br. at 15. This is a misstatement of law. Shannon's knowledge of John Doe 2's age is not an element of the offense of sexual exploitation of a minor, and he would responsible for the sexually explicit images he coerced from John Doe 2, even if he thought, mistakenly, that John Doe 2 was eighteen. *United States v. Fletcher,* 634 F.3d 395 (7th Cir. 2011); *United States v. United States District Court,* 858 F.2d 534 (9th Cir. 1988). See

*also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 76 n.5 (1994) ("[P]roducers may be convicted under 2251(a) without proof they had knowledge of age...") (*dicta*).

### 3. Shannon would not have prevailed on his motion for new trial, and cites no reason why he would

Shannon claims that trial counsel did not meaningfully file a Motion for New Trial, but does not state what arguments or evidence he would have presented that would have been more persuasive to the Court.  The Seventh Circuit has repeatedly held that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even when those arguments raise constitutional issues)." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (citations omitted). Regardless of trial counsel's motion, the Court clearly "allocate[d] scant judicial resources and sufficient time to address" Shannon's motion.  R. 77 at 2, n1. In the instant pleading, Shannon advances no new legal theory, nor does he show that but for trial counsel's thin, but adequate, motion, he would have prevailed on his motion for trial, or that his new trial would have resulted in an acquittal.  In order to satisfy the prejudice component, a petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Shannon simply states that trial counsel could have done better. That argument fails to meet the *Strickland* standard.

### B.   Judicial Bias

Shannon next claims that the interest of justice requires a new trial because Judge Bruce allegedly had a disqualifying bias against him and in favor of the prosecution. His

argument is based primarily on his interpretation of a single e-mail exchange between Judge Bruce and a paralegal five months prior to the Shannon's sentencing, as well as his interpretations of other e-mails that did not pertain to this case sent at other times by Judge Bruce to certain former colleagues at the U.S. Attorney's Office. Because Shannon has not and cannot show actual bias, his motion should be denied.

The Due Process Clause of the Fifth Amendment "requires a fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citations and quotation marks omitted). "A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him." *Edwards v. Balisok*, 520 U.S. 641, 647 (1997) (citations omitted). In other words, a biased judge constitutes a structural error that "deprive[s] [a] defendant[] of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair." *United States v. Harbin*, 250 F.3d 532, 543 (7th Cir. 2001) (quoting *Neder v. United States*, 527 U.S. 1, 8-9 (1999)) (quotation marks and ellipses omitted).

"[A] litigant is not denied due process by either the appearance of partiality or by circumstances which might lead one to speculate as to a judge's impartiality." *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc); *see Suh v. Pierce*, 630 F.3d 685, 692 (7th Cir. 2011) (distinguishing the broader recusal standard under 28 U.S.C. § 455 that requires a judge to recuse himself whenever "his impartiality might be questioned" from the standard for proving a due process violation). Instead, "[t]he general

presumption is that judges are honest, upright individuals and thus that they rise above biasing influences." *Franklin v. McCaughtry*, 398 F.3d 955, 959 (7th Cir. 2005) (citations omitted). "To prove a disqualifying bias, a petitioner must offer either direct evidence or 'a possible temptation so severe that [a reviewing court] might presume an actual, substantial incentive to be biased,'" *id.* (quoting *Del Vecchio*, 31 F.3d at 1380), and the actual or presumed bias must be "in [the defendant's] own case." *Bracy*, 520 U.S. at 905.

Almost every bias case before the Supreme Court where a due-process violation has been found has involved presumptive, not actual, bias. There are three situations in which the Court has found presumptive bias: (1) the judge had a direct, personal, or substantial pecuniary interest in the outcome of the case; (2) the judge had been the target of personal abuse or criticism from the party before him; and (3) the judge had the dual role of investigating and adjudicating disputes and complaints. *See, e.g., Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 824–25 (1986) (holding that the justice's interest in the case was "direct, personal, substantial, and pecuniary" and concluding that his participation in the case "violated appellant's due process rights") (quotation marks, citation, and brackets omitted); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (reasoning that "experience teaches that the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable" in cases in which the judge "has been the target of personal abuse or criticism from the party before him") (citations omitted); *In re Murchison*, 349 U.S. 133, 139 (1955) (holding that it was a violation of due process for one adjudicator to preside as the grand jury judge and trial judge for the same defendants); *see also Del Vecchio*, 31 F.3d at 1373-74 (discussing Supreme Court bias cases).

### 1.  The April 2017 email is not evidence of disqualifying bias

Shannon contends that the emails between Judge Bruce and Ms. Klayer raise "serious questions about Judge Bruce's bias in favor of the government and against [Shannon]." Pet.Br. 30. Technically, the judge telling Ms. Klayer that he was not going to move the sentencing hearing was an ex parte communication since it pertained to a pending case and defense counsel was not copied. But Shannon's argument that this communication exhibits bias in favor of the government is without support.  Instead, the communication reflects that the judge was unwilling to be flexible with respect to a probation officer's training requirements by rescheduling a sentencing hearing. It falls well short of evidence of a judge seeking to give the government a leg up for a sentencing hearing—i.e., a hearing that as of April 4, 2017, was still more than five months away.

Courts have continually held that brief conversations between judges and attorneys that do not address the merits of the case require no remedy under Rule 33 or any other collateral proceeding. *See Drobny v. Comm'r of Internal Revenue*, 113 F.3d 670, 680 (7th Cir. 1997) (judge's *ex parte* communication with prosecution attorney regarding scheduling did not address substantive matters warranting a reversal of the tax court's decision, as "it is well-established  that  an ex parte communication which  does  not concern the *merits* of the case is permissible." (emphasis in original)); *see also United States v. Alcantara–Rueda*, 81 F. App'x 204, 205 (9th Cir. 2003) (while "ex parte communications between judges and attorneys are to be frowned upon, recusal was not required because there was no indication that judge's communication with the prosecutor could affect or did affect the sentence"); *United States v. Womack*, 2016 WL 1417867, at *8 (W.D. Mo.  Mar.

17, 2016), *report and recommendation adopted*, 2016 WL 1444562 (W.D. Mo. Apr. 8, 2016) (prosecutor's email to the court including a link to a news article that referenced a detention decision already made by the court, "is hardly the sort of conduct that is so outrageous that it shocks the conscience of the Court."); *United States v. Adbox, Inc.*, 234 F. App'x 420, 421 (9th Cir. 2007) (in a bankruptcy proceeding, ex parte contacts between counsel for the trustee and the judge and his law clerk did not warrant recusal because they were "purely procedural" and there was no evidence that the communications influenced the court's decision). When viewed in context, the email the court sent to a paralegal (unbeknownst to the prosecutor) was non-substantive and does not indicate that the court lacked impartiality. That innocuous message does not warrant a new trial, under Rule 33 or any other standard.

### 2.  Other Email Communications

Shannon claims that the emails between Judge Bruce and a U.S. Attorney's Office employee demonstrate a pattern of bias in favor of the government through "unethical ex parte communications." Pet. Br. 21. Email communication is ubiquitous in today's legal world, including by judges. Unfortunately, e-mails are frequently prepared and sent quickly, without review. They often contain a familiar or jovial tone, which can result in them being misconstrued and taken out of context, especially by those who are not parties to the conversation.

Since learning of the December 2016 email string involving the *Nixon* trial (*see supra* note 10), the U.S. Attorney's Office has identified 1,233 documented communications that

34

involved Judge Bruce and one or more members of the USAO.[13] The vast majority of these communications do not involve substantive discussions regarding cases. In fact, a number of these communications and attachments involved multiple addressees in addition to U.S. Attorney personnel and concerned, for example, matters such as birth, death, and other personal announcements; courthouse holiday and social gatherings; building maintenance and security issues; court administration; employment and retirement announcements; and administrative issues relating to Judge Bruce's departure from the U.S. Attorney's Office. *See, throughout,* Bates Nos. 4-3789.

### a.      The ex parte communications

Of the 1,233 communications, the USAO has identified 101 communications (478 pages, including attachments, duplicate emails, and duplicate attachments) that each

---

[13] These communications include 1,230 emails, a number of which include multi-page attachments, such as search warrant documents, advance copies of plea agreements, and criminal complaint documents. *See* Bates Nos. 1-2266, 2268-2992, 3008-3720, 3725-3789. In addition to the emails, the U.S. Attorney's Office identified three other communications: (1) an April 14, 2016, email memorandum to file prepared by a supervisory AUSA regarding a conversation he had with Judge Bruce during which the judge was critical of an AUSA, *see* Bates Nos. 3721-3722; (2) a March 10, 2017, letter from an AUSA to a defense attorney, see Bates No. 3723; and (3) a screen shot of a May 2018 text message string between Judge Bruce and a USAO paralegal (three text messages, total). *See* Bates No. 3724.

There is an additional document that is not included in this number. That additional document is an internal memorandum written by an employee of the United States Attorney's Office concerning a verbal communication(s) that the employee had with Judge Bruce. The conversation(s) with Judge Bruce that the author documented in the internal memorandum was not an ex parte communication and did not pertain to any defendant or any case. The internal memorandum also contains privileged and confidential information; therefore, the internal memorandum will be submitted to the Court *in camera* for the Court to make a determination on which parts of the memorandum, if any, can be disclosed.

(1) were, or were part of a series of, potentially ex parte communications;[14] and (2) were not previously disclosed to defense counsel in the cases to which the communications related. *See* Gov. App.103-137. In addition to having turned over the April 2017 email exchange in this case, the United States has since turned over to defense counsel the other ex parte communications where it could determine the cases to which the communications related.

In general, but not exclusively, the ex parte communications involving U.S. Attorney's Office personnel and Judge Bruce (or his chambers email address) related to the scheduling of hearings; the provision of documents, such as plea agreements and jury instructions, to the judge in advance of a hearing or trial; and Judge Bruce inquiring about or USAO personnel informing the judge of whether the United States anticipated a particular case going to trial.

Aside from the April 2017 email exchange, *see* Bates No. 2690-694, none of the ex parte and potentially ex parte communications related to Shannon's case. Shannon nonetheless contends that the communications collectively demonstrate a systemic bias in favor of the United States, and thus, against him. Pet.Br. at 50. The United States disagrees. The e-

---

[14] In identifying which communications were ex parte, the United States used the criteria of (a) a communication between an AUSA (or a USAO staff member), (b) in a pending matter over which the judge was presiding, (c) where opposing counsel was not copied on the communication. *See* Illinois Rule of Professional Conduct 3.5(b); Black's Law Dictionary 597 (1999 ed.). Excluded from those communications that the United States identified as ex parte were communications that related to matters that were appropriately ex parte (*e.g.*, scheduling appointments for criminal complaints, search warrants, and Title III materials and the provision of such materials to the judge). Aside from some exceptions, also excluded from those communications identified as ex parte were communications that related to the scheduling of an initial appearance or an arraignment in an under-seal matter.

36

mails do not, collectively or individually, demonstrate actual bias or a possible temptation so severe as to overcome the presumption that Judge Bruce rose above any biasing influences. *Franklin*, 398 F.3d at 959. This is particularly true given that the non-*Shannon* related, ex parte communications largely pertained to administrative matters.

In his motion, Shannon highlights communications (or series of communications) in six cases that he contends demonstrate a disqualifying bias in favor of the United States. None of these communications establishes the disqualifying bias alleged by Shannon. Shannon's argument that these communications establish Judge Bruce's disqualifying bias, when taken into context, fare no better than his other claims regarding cases in which he was not involved.

### i. *United States v. Sarah Nixon*, No. 15-cr-20057 (Bates Nos. 2539-2548)

The December 2016 Email Exchange in the *Nixon* case involved a paralegal who was not part of the *Nixon* trial team inquiring why Judge Bruce did not attend the retirement reception for outgoing U.S. Attorney James Lewis. In his response, Judge Bruce explained that he was in trial and expressed his views of defendant Nixon's testimony, the prosecution's cross-examination, and the probability of an acquittal based on the proceedings themselves. This is significant because, in the context of the recusal statute, *see* 28 U.S.C. § 455(b)(1) (personal bias or prejudice), the Supreme Court has stated that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that

would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see Del Vecchio*, 31 F.3d at 1370-72, 1379 (citing *Liteky* in support of its due process analysis). Thus, the question is not whether a presiding judge has reached such opinions during the course of the proceedings, but whether the judge can "discipline[] [himself] to conduct fair proceedings and make impartial rulings despite the opinion one inevitably forms during the proceedings." *In the Matter of Huntington Commons Assoc.*, 21 F.3d 157, 158 (7th Cir. 1994) (quotation marks and citation omitted).

Unfortunately, Judge Bruce incautiously expressed his views to a prior colleague in the U.S. Attorney's Office who was not part of the prosecution team. Regardless, his reaching such opinions during the course of the trial, based on the evidence introduced and events that occurred during the trial, did not rise to the level of disqualifying bias. If judges forming opinions during the course of criminal trials concerning the veracity of witnesses, the performance of attorneys, and the probability of an outcome constitutes judicial bias in violation of the Due Process Clause, there is likely no criminal proceeding that could pass constitutional muster. "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943) (quoted by *Liteky*, 510 U.S. at 551).

ii.     *United States v. Jermaine Speed,* No. 14-cr-20056 and Appeal No. 15-1520 (Bates Nos. 0775-0791, 1228-1292, 1294, 1766, 1939)

38

Shannon argues that the communications relating to the district court case and direct appeal of *United States v. Jermaine Speed* establish that Judge Bruce had an inappropriate interest in the outcome of these cases.

*A. The district court-related emails.* Mr. Speed was indicted on September 10, 2014, for multiple drug-trafficking crimes. Docket, Case No. 14-cr-20056 (Doc. 1). On September 23, 2014, the magistrate judge set the arraignment for 2:30 p.m. that day. *Id.* (09/23/2014 entry). Larry Beaumont, a former AUSA of 20 years and former colleague of Judge Bruce's, represented Mr. Speed. *Id.* (Doc. 5); *see also* http://www.news-gazette.com/news/local/2017-12-31/verdict-federal-judge-colin-bruce-hes-very-fair-even-handed.html) (viewed Dec. 17, 2018).

The day prior to the arraignment, Ms. Klayer sent an email addressed to a member of the clerk's office and one of the magistrate judge's law clerks, asking if the magistrate judge's trial calendar would prohibit him from conducting the arraignment on September 23. *See* Bates No. 775. In that same email, Ms. Klayer stated, "Larry Beaumont is the defense attorney [and] would like to have [the arraignment] . . . late tomorrow if possible (like 4:30) because he has court in Chicago at 1:30." *Id.* The law clerk indicated that he/she was unsure if the magistrate judge would be in trial on the twenty-third and advised Ms. Klayer to "check with CSB's chambers . . . to get on the calendar with him, so that we know that at least one of [the judges] will be available." *Id.*

Ms. Klayer then forwarded the email chain to Judge Bruce's chambers address, his courtroom deputy, and one of his law clerks, stating "see below." Bates Nos. 775-778.

Judge Bruce, replying only to Ms. Klayer, responded, "What would be the most inconvenient time for Larry?" *Id.* at 779. Klayer answered, "LOL! Early in the morning or 1:30 when he's in Chicago in court!!!! But if we do that, he's just going to call and cry!" *Id.* at 781.

According to Shannon, the email exchange between Judge Bruce and Ms. Klayer is "another example of Judge Bruce casually engaging in ex parte discussions […] as if he were still a member of [the U.S. Attorney's Office]. Pet.Br. at 34. While Shannon indicates that it is difficult to gauge "sarcasm versus partiality", (*Id.*) not even Mr. Beaumont took exception to the tone of the email when the government produced it to him in September 2018. According to the defense in the *Nixon* case, Mr. Beaumont is of the view that the judge was being sarcastic. *See Nixon*, 15-cr-20057, R. 173 at 12. That is a personality trait that one might accurately conclude that the judge possesses if one were to read all of Judge Bruce's communications, *see, e.g.*, Bates Nos. 229-30 (the judge confessing, "I live for the snark.").

      *B.*    *The appeal-related emails*.  After Judge Bruce sentenced Mr. Speed to a 216-month prison sentence, which was 46 months below the low end of the Guidelines range, and entered final judgment on March 11, 2015, the defendant pursued a direct appeal.  *See* Docket, *United States v. Speed*, No. 14-cr-20056 (Docs. 22, 35, 37); Docket, *United States v. Speed*, Appeal No. 15-1520. Approximately four months after the entry of final judgment, on July 6, 2015, Mr. Speed publicly filed his opening appellate brief.  *Speed* Appeal Docket (Docs. 10, 11). In his brief, Mr. Speed raised two issues: (1) whether Judge Bruce erred by imposing discretionary supervised release conditions

without making the findings to support three of the conditions, and (2) whether the condition that Mr. Speed not possess a "dangerous weapon" was unconstitutionally vague. *Speed* Appeal Docket (Doc. 11 at 2).

After Mr. Speed filed his brief on July 6, that same day Ms. Klayer forwarded a copy of Mr. Speed's brief to Judge Bruce's chambers address. *See* Bates Nos. 1228-1292.  In her email, Ms. Klayer stated: "The attached brief was filed today. Since we weren't sure if Judge Bruce would receive a copy or even know that it had been filed, we are forwarding a copy to chambers for his review given the issues that were raised on appeal." *Id.* at 1228. The following day, on July 7, Judge Bruce responded, "Unbelievable. Thanks for the early warning." *Id.* at 1294.

AUSA (former) Jason Bohm, then a member of the USAO's appellate section, entered his appearance in the *Speed* appeal as lead counsel for the government on July 8, 2015. *Speed* Appeal Docket (Doc. 8). He filed the government's responsive brief on August 6, 2015. *Speed* Appeal Docket (Doc. 16).

More than two months later, on October 26, 2015, the Seventh Circuit affirmed the judgment of the district court in another appeal, *United States v. Armour*, 804 F.3d 859 (7th Cir. 2015). *Armour* was a direct appeal from one of United States District Judge Sue E. Myerscough's criminal cases that involved issues concerning the imposition of conditions of supervised release, including two of the conditions at issue in the *Speed* appeal ("use of alcohol" prohibition and "dangerous weapon" prohibition), and in which Mr. Bohm was appellate counsel of record for the government. On the day that the Seventh Circuit affirmed the judgment of the district court in *Armour*, Judge Bruce sent an email to AUSA

41

Bohm, stating, "Nice job in US v Armour. Good ammo for your Speed argument also. Top notch." Bates No. 1766.

On January 19, 2016, the Seventh Circuit affirmed the judgment of the district court in *United States v. Speed*, 811 F.3d 854 (7th Cir. 2016). In that opinion, the court cited with approval its decision in *Armour* in holding that the "dangerous weapon" prohibition was not unconstitutionally vague. *See Speed*, 811 F.3d at 861. That same day, Judge Bruce sent an email to AUSA Bohm, stating, "Well done, sir. Well done." Bates No. 1939.

Contrary to Shannon's contention, the email between Ms. Klayer and Judge Bruce and the email from Judge Bruce to AUSA Bohm were not ex parte communications, since the district court case had concluded and was never remanded after the direct appeal. Nonetheless, the government does not seek to quibble with the defense on this point since the defense's ultimate claim is that Judge Bruce was biased in favor of the government and against Mr. Speed (and, by inference, all defendants, including Shannon).

There is a more plausible explanation other than some overarching bias against Mr. Speed, who was sentenced by Judge Bruce to a below-guidelines range sentence. Setting aside for the moment the issue of whether it is proper for Judge Bruce to communicate in this fashion with former colleagues, the "unbelievable" comment by Judge Bruce concerning Mr. Speed's brief appears to be the judge expressing frustration over a defendant who was appealing supervised release conditions and procedures to which he did not object at sentencing. *See* Gov. App. 113, 114. Although the judge's expression of his frustration in an email to the government was ill-advised, we suggest that the frustration he had was not unique among district court judges at that time, when appeals

42

of supervised release conditions were commonplace, even after defendants had raised no objections at sentencing. To be clear, the government is not condoning these emails, but Judge Bruce's "unbelievable" comment—particularly in a matter over which he then had no jurisdiction—does not and cannot amount to a disqualifying bias against Mr. Speed or criminal defendants as a whole.

Similarly, the judge's "nice job" and "well done" compliments to AUSA Bohm were just that: compliments.  Those compliments concerning AUSA Bohm's advocacy do not evidence a temptation that was so severe that a reviewing court must presume that Judge Bruce was unable to impartially preside over Mr. Speed's case, or, as relevant here, over Shannon's trial. *Franklin*, 398 F.3d at 959.

The judge's comment to AUSA Bohm that the *Armour* decision was "good ammo" for the *Speed* appeal does not begin to reflect that Judge Bruce and the U.S. Attorney's Office were "collaborating to litigate Mr. Speed's appeal" or to undermine Seventh Circuit precedent. Pet. Br. at 51. Notably, the government filed its opening brief in *Speed* more than two-and-a-half months (August 6, 2015) before the Seventh Circuit decided *Armour*. Further, the government certainly did not need the prompting of Judge Bruce to file a letter of supplemental authority when the court of appeals decides one case (*Armour*) that directly addresses an issue raised in a pending appeal (*Speed*).  Judge Bruce's comment, which was actually an incontrovertible observation about something that was obvious, does not lead to the conclusion of a disqualifying bias against Mr. Speed or any other defendant.

43

Finally, detracting from the conclusion that Judge Bruce and the government have collaborated on any appeal is the fact that the government has not hesitated to confess error against the judge when the government has determined that his rulings are unsupportable on appeal. *See, e.g., United States v. Gmoser*, Appeal No. 16-3054; *United States v. Shoffner*, Appeal No. 17-2605.

###### iii.  *United States v. Michael Baker*, No. 16-cr-20065 (Bates Nos. 2696-2710)

In this series of communications (April 6-7, 2017), Judge Bruce inquired ex parte of Ms. Klayer which pending criminal cases were likely to go to trial. The cases they discussed included four in which AUSA Bryan Freres and AUSA Katie Boyle were lead counsel: (1) *United States v. Deon Evans*, 16-20067, then set for trial on April 25, 2017; (2) *United States v. Roy Collins*, 16-20059, then set for trial on June 19, 2017; (3) *United States v. Michael Baker*, 16-20065, then set for trial on May 2, 2017; and (4) *United States v. Emerson Brooks*, No. 16-20012, then set for trial on May 23, 2017. *See* Bates No. 2698; Gov. App. 70-71, 82, 95, 105.

In the email string, Judge Bruce asked, "Do Bryan and Katie understand that there will be no more continuances in these cases?" Bates No. 2697. Ms. Klayer relayed that message to AUSAs Freres and Boyle, stating, "[Judge Bruce] wants to know if they are going to be definite trials and to let us know that he will NOT continue any of them because of the Schock trial [*United States v. Aaron Schock*, 16-cr-30061], which will be held in July and probably part of August [2017]." *Id.* at 2698.

44

Shannon alleges this email string is evidence of bias in favor of the government. The government agrees that the email string was an ex parte communication. That, however, is where our agreement with Shannon ends. There is a non-nefarious explanation for the judge's ex parte "no more continuances" comment to Ms. Klayer (and indirectly to AUSAs Freres and Boyle): (1) he was emphasizing or re-emphasizing his *publicly* proclaimed "one continuance per party" rule in an ex parte manner, *see, e.g.,* Gov. App. 23, 26-27, 30-31, 34, 37-38, 41, 44-45, 48-49, 54, 58-59, 62-63; (2) he was informing the government that it would not grant any government motion for a continuance; and/or (3) he was endeavoring to maintain what he claimed was "the fastest case closure rate in the district," Bates No. 995; *see also* Gov. App. 59. Further in *Evans*, *Collins*, *Baker*, and *Brooks*, Judge Bruce subsequently reset the scheduled trial date for a later date as a result of pending motions, defense motions to continue, or the parties advising the court that the defendant would be entering a plea of guilty. *See* Gov. App. 71-72, 83-84, 95, 105.

Finally, without making any accusation of wrongdoing against any defense attorney, the government notes that in the same email string, Judge Bruce wrote, "[Assistant Federal Public Defender Elisabeth Pollock] said she will need a continuance in Cizmar [*United States v. Cizmar*, No. 16-cr-20080] unless she has all the forensics, and even then she may want a continuance." Bates No. 2706 (on April 7, 2017). On that date, however, there was no pending motion for a continuance in *United States v. Cizmar. See* Docket Sheet, Case No. 16-cr-20080, Gov. App. 121. This certainly suggests that Judge Bruce might have engaged in similar scheduling discussions with defense attorneys to which the government was not privy. Assuming Judge Bruce did so no more suggests a

disqualifying bias against the government in those cases than his ex parte scheduling discussions with a government legal assistant suggest a disqualifying bias against Defendants Evans, Collins, Baker, and Brooks, let alone Shannon.

> ### iv.    *United States v. Edward Dorsey,* No. 14-cr-20026 (Bates Nos. 1463-1476); *United States v. Jessie Dorsett,* No. 16-cr-20043 (Bates Nos. 2492, 2495)

In the *Dorsey*-related email string (July 22, 2015), Ms. Klayer sent an email to Judge Bruce's chambers email address, inquiring whether a telephone status conference scheduled for July 31, 2015, could be rescheduled to the week of August 3, 2015, because AUSA Miller would be out of town on July 31. Judge Bruce responded, "Sure.  This is just a TSC to set the matter for a resentencing. File a motion to continue. The morning of August 21 looks wide open." Bates No. 1465. The government, however, never filed a motion regarding an August 21 date because, while Judge Bruce and Ms. Klayer were emailing, one of the judge's law clerks reset the hearing for August 3.  *Id.* at 1467, 1469; *see also* Docket Sheet, No. 14-cr-20026.  Ms. Klayer informed the judge of the same, and the judge replied, "I'm good.  Whatever. (easy-going judge…. Love my job. . . .)."  *Id.* at 1471.  Klayer responded, "Yeah dude—you're rockin' it.  You were made for that position. ☺"  *Id.* at 1473.

Similarly, in the *Dorsett*-related emails (November 8, 2016), Legal Assistant Soni Holmes sent an email to the judge's email address indicating that she was preparing to file a writ of habeas corpus *ad testificandum* for Defendant Dorsett to appear in federal

46

court and inquired whether "November 29 at 10:00 [would] work for the [sic] Judge Bruce." Bates No. 2492. Judge Bruce replied, "Roger-dodger. GO SONCHETTA!"

As Shannon rightly notes (Pet.Br. at 31), in neither instance was it necessary to schedule the hearing ex parte. In fact, in none of the instances involving ex parte communications to schedule a hearing did it appear necessary to do so ex parte. Further, as Shannon states, each email string reflected an informality and familiarity between those involved. *Id.* The personal nature into which these email strings (as well as others) digressed perhaps reflects a level of unprofessionalism. Such dialogue, however, does not and cannot lead to the conclusion that a disqualifying bias under the Due Process Clause existed—i.e., the conclusion that the judge had a "direct, personal, substantial, or pecuniary interest" in any case, *Franklin*, 398 F.3d at 960, including Shannon's, because Judge Bruce communicated in an informal manner with legal assistants in the U.S. Attorney's Office.

> ### v.      *United States v. Jason Gmoser*, No. 14-cr-20048 (Bates No. 1985)

The context of Judge Bruce's February 1, 2016, reply email to AUSA Peirson—"My bad. You're doing fine. Let's get this thing done," Bates No. 1985—demonstrates that the judge was not aligning himself with the government or against Mr. Gmoser. Judge Bruce's comments came in response to Ms. Peirson's email (on which defense counsel was copied) in which she apologized for any confusion she may have created at the pretrial conference earlier that day. At that hearing, Judge Bruce alternatively complained and expressed confusion regarding whether Ms. Peirson had filed the required trial

documents (she had).  *Id.*; Gov. App. 18-20.  Earlier, during a November 6, 2015, pretrial hearing, Judge Bruce was also critical of Ms. Peirson's alleged failure to determine the availability of the government's expert witness for the November 2015 trial setting. Gov. App. 4-5.  The judge also repeatedly stated that he was "unhappy" that government counsel was affecting his trial calendar.  Gov. App. 4, 11, 13-14.

Taken together, these events serve to explain Judge Bruce's February 1, 2016, ex parte apology ("My Bad. You're doing fine.") and his interest in getting the case tried on the trial date ("Let's get this thing done.").  He was not aligning himself with the government or government counsel against a defendant, as Shannon suggests.

**vi.     *United States v. Oscar Martinez*, No. 14-cr-20035 (Bates Nos. 859-860)**

The *Martinez*-related email string (October 29, 2014) began with an email from a probation officer addressed to a magistrate judge.  Copied on that email were Judge Bruce, a person from the clerk's office, AUSA Miller, and Ms. Klayer.  *See* Bates No. 0859. In the email, the probation officer informed the magistrate judge that Defendant Martinez, who was in pretrial release, had violated the rules of location monitoring and had been admonished by a probation officer in the district where Martinez was then residing.  *Id.*  In that same email, the probation officer advised Judge Bruce that Martinez was scheduled to appear by telephone on October 31, 2014, and asked the judge "to inform the offender that the Court is aware of his noncompliance and request that he abide by all of his conditions of bond."  *Id.*  Judge Bruce responded, "I can do what you request. Thanks."  *Id.* at 860.

48

Shannon contends that Judge Bruce's response reflects a willingness to make "substantive decisions" in a criminal case with notice to the government but not to the defense; consequently, the judge's response to the probation officer "reveals an inability to fairly and impartially preside over criminal cases." Pet.Br. at 36.

To the extent that the judge's "no action" decision on an alleged pretrial release violation constitutes a substantive decision, it was ultimately a decision that was beneficial to the defendant who was on bond. This, in turn, negates any inference of bias against Martinez (not to mention Shannon). In fact, Martinez's conditions of bond remained unchanged at the October 31, 2014, hearing. *See* Docket, Case No. 14-cr-20035 (10/31/2014 entry). Further negating any inference of bias against Martinez (or any other defendant), is the fact that Judge Bruce sentenced him to 12 months and one day of imprisonment, even though Martinez was responsible for transporting approximately 150 kilograms of cocaine, the bottom of his advisory Guidelines range was 46 months' imprisonment, and the government recommended a sentence of 25 months. *Id.* (Docs. 73, 84, 86).

In sum, Shannon's claim that the e-mail exchange between Judge Bruce and the probation officer demonstrated bias against Martinez, or defendants as a whole, is untenable in light of this record.

### b. Other Communications

Contrary to Shannon's characterization, the other emails are not ex parte. Not every communication between a judge and a litigant is ex parte; a communication is only ex parte if (a) the communication was between the judge and only one side or litigant, (b) in a pending matter over which the judge was presiding, and (c) where opposing counsel was not included on the communication[15]. *See* Illinois Rule of Professional Conduct 3.5(b); Black's Law Dictionary 597 (1999 ed.). Many of the communications that involved Judge Bruce and at least one member of the U.S. Attorney's Office reveal that the judge maintained a degree of friendship with his former colleagues, including former U.S. Attorney James Lewis and Paralegal Specialist Staci Klayer, but do not involve matters over which the court was presiding.[16] The relationships that Judge Bruce maintained with various members of the U.S. Attorney's Office after his appointment to the bench—while at times involving informal dialogue—do not constitute a disqualifying bias. As the

---

[15] Shannon alleges that an email exchange between Judge Bruce and the undersigned AUSA that occurred in November 2014, five months before Shannon was arrested in this case, and twenty months before Judge Bruce presided over his trial, which involved a matter that did not concern any proceeding before the court, shows a bias in favor of the prosecutor. Pet. Br. 48; Bates Nos. 904-40. Shannon claims that the unknown topic of this email exchange "raises the specter of bias in favor" of the undersigned. Pet. Br. 48. As evident from Judge Bruce's comments about the undersigned AUSA both on the record and to other members of the U.S. Attorney's office, Judge Bruce did not hold this AUSA in favor. *See e.g.* Bates Nos. 1817-24; 3721-22; 133, 145, 198, 203, 209; Gov. App. 4, 11, 13-14.

[16] Additionally, although not reflected in the communications, Judge Bruce maintained a friendship with John Childress, who served as an AUSA, Criminal Chief, First Assistant, and United States Attorney. There were two waiver/filing/plea cases over which Judge Bruce presided that involved documents prepared under AUSA Childress's signature. *See* Dockets, *United States v. Ashley Miller*, No. 17-cr-20015 (R. 1, 4) & *United States v. Kami Miller*, No. 17-cr-20042 (R. 1, 4). In each case, AUSA Eugene Miller appeared for the United States at the waiver/filing/plea and sentencing hearings. Additionally, government pleadings were signed by AUSAs under Mr. Childress's official capacity title of United States Attorney between December 2017 and October 2018. The communications between Mr. Childress and Judge Bruce are found at Bates Nos. 279, 280, 367, 368, 2145, and 2148-2149.

Seventh Circuit has recognized in the context of the "appearance of partiality" rule of 28

U.S.C. § 455(a):

> In today's legal culture friendships among judges and lawyers are common.
> They are more than common; they are desirable. A judge need not cut
> himself off from the rest of the legal community. Social as well as official
> communications among judges and lawyers may improve the quality of
> legal decisions. Social interactions also make service on the bench, quite
> isolated as a rule, more tolerable to judges. Many well-qualified people
> would hesitate to become judges if they knew that wearing the robe meant
> either discharging one's friends or risking disqualification in substantial
> numbers of cases.

*United States v. Murphy*, 768 F.2d 1518, 1537 (7th Cir. 1985); *see also Dyas v. Lockhart*, 705

F.2d 993, 995-97 (8th Cir. 1983) (in a capital murder case, holding there was no structural

error upon which bias would be presumed even though the trial and sentencing judge

was the uncle of the lead prosecutor and father of the two assistant prosecutors who

participated in the case).

Nothing in Shannon's motions suggests how any purported appearance of

impropriety, based on Judge Bruce's background as a prosecutor, had the slightest impact

on trial proceedings. Such bias is not imputed to a judge due to such a background.

Instead, the law presumes that regardless of their personal backgrounds, judges are

presumed to "rise above" potential biasing influences.

> Judges are human; like all humans, their outlooks are shaped by their lives'
> experiences. It would be unrealistic to suppose that judges do not bring to
> the bench those experiences and the attendant biases they may create. A
> person could find something in the background of most judges which in
> many cases would lead that person to conclude that the judge has a
> "possible temptation" to be biased. But not all temptations are created

equal. We expect—even demand—that judges rise above these potential biasing influences, and in most cases we presume judges do.

*Del Vecchio*, 31 F.3d at 1372 (citing *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975).  The record here is void of any indication that the court favored one side or another at any point during the proceedings. With no evidence of judicial bias, Shannon cannot show that the April 2017 email exchange involving the probation office's scheduling conflict with his sentencing hearing had a prejudicial effect that "'rendered [his] trial fundamentally unfair,'" particularly since it occurred after his trial. *United States v. Turner*, 836 F.3d 849, 867 (7th Cir.), *as supplemented,* 840 F.3d 336 (7th Cir. 2016) (internal quotations marks omitted).

A review of the remaining e-mail communications between Judge Bruce and some of his former colleagues do not reveal any bias against the defendant, or any defendant, for that matter. They also do not reveal any systematic bias in favor of the prosecution. Instead, as might be expected, they demonstrate that Judge Bruce made positive comments to some former colleagues and negative comments about other former colleagues. *See, e.g.,* Bates 668, 212. Unfortunately, as was revealed in the *Nixon* e-mail, it was not uncommon for Judge Bruce to make negative comments about former colleagues to other former colleagues. A fair reading of these e-mails reveals that Judge Bruce may have been biased *against* some of the prosecutors who appeared before him, including the prosecution team in this case, but not biased in their favor.

For example, Judge Bruce forwarded an opinion he wrote criticizing AUSA Peirson to U.S. Attorney Lewis, Bates Nos. 1817-24; criticized AUSA Peirson's conduct to her

supervisor, Bates No. 3721-22; and criticized her in e-mails to other members of the U.S. Attorney's Office. *See, e.g.,* Bates Nos. 133, 145, 198, 203, 209. While Judge Bruce sent a friendly e-mail forwarding an article to AUSA Miller, *see, e.g.,* Bates Nos. 743-51, he also sent e-mails to others that contained critical comments regarding AUSA Miller. *See, e.g.,* Bates Nos. 133, 145, 209, 212. Along the same vein, Judge Bruce sent friendly e-mails to former AUSA Jason Bohm, *see* Bates Nos. 49, 54, 58, 95, 200, 205 & 569-71, but was uncomplimentary of him in an e-mail to another former colleague. *See* Bates No. 212.

In fact, even though Judge Bruce had numerous friendly communications with U.S. Attorney Lewis, *see, e.g.,* Bates Nos. 225-30, 227, 245, 1026, 1111, on at least one occasion, he made a comment to another person that was unflattering to U.S. Attorney Lewis. *See* Bates No. 668. In his e-mails, Judge Bruce also disparaged other AUSAs, including some, who were former colleagues, *see, e.g.,* Bates Nos. Nos. 37 (describing an AUSA as "a man without honor"); 2423 (complaining that an AUSA had "less skill than a third year law student", and was "often not prepared"); or the U.S. Attorney's Office in general. *See, e.g.,* Bates Nos. 1697 ("The Urbana USAO is going downhill"), 1814 ("lots of problems in the USAO, caused by the usual suspects"). The judge's communications do not show bias in favor of the government, as Shannon alleges, but rather criticisms of the U.S. Attorney's Office, and in particular, certain attorneys in the USAO.

At most, the communications between Judge Bruce and some of his former colleagues reveal that Judge Bruce maintained a degree of personal relationship or friendship with some of them, but not with others. In addition to the e-mails referenced above, Judge Bruce shared friendly, non-case related e-mails regarding a variety of subjects with

various former USAO colleagues, including former First Assistant, now U.S. Magistrate Judge, Eric Long, *see, e.g.,* Bates Nos. 39-40, 307-308, 659-695; Ms. Hopps, *see, e.g.,* Bates Nos. 440-445, 1701-1706; Ms. Holmes, *see, e.g.,* Bates Nos. 1097, 2495 and Ms. Klayer, *see, e.g.,* Bates Nos. 106, 149, 201, 363, 604, 763, 764, 1454, 1927, 1994, 2142.

In short, the relationships that Judge Bruce maintained (or purported to maintain) with certain members of the U.S. Attorney's Office—even those that included off-putting dialogue—do not overcome the strong presumption that the judge held the proper balance between the government and Shannon. Consistent with the law, the government presumes that Judge Bruce was able to "rise above" the "biasing influences" of his personal views of some of his former government colleagues, including trial counsel in the instant case. *Franklin*, 398 F.3d at 959.

Shannon's motion can only succeed if he could establish that the information to which he points – the April 2017 email exchange between the trial judge and Ms. Klayer about the probation office's training schedule (or collectively the entirety of the documented communications between Judge Bruce and the United States Attorney's Office)– is evidence of a disqualifying bias that overcomes the presumption that the judge presided over his trial fairly. He cannot.

### C.   Any Violations of the Rules of Professional Conduct Are Not Themselves a Basis for Granting a New Trial in a Criminal Case

In his motion, Shannon alternatively argues (Pet.Br. at 54-56) that, by not reporting the email exchanges in this case, and the *Nixon, Speed,* and *Gmoser* cases, immediately, the government violated the Rules of Professional Conduct.  Therefore, Shannon contends,

he should be granted a new trial.  Shannon, however, does not cite any authority for the proposition that a violation of the Rules of Professional Conduct is itself a separate basis for granting a new trial in a criminal case. In fact, Shannon apparently agrees that a violation of the Rules of Professional Conduct is not a structural error that alleviates him of his burden of demonstrating prejudice, since he explains why, in his view, the government's alleged violations of the ethical rules prejudiced him.  *See* Pet.Br. at 55-56.

Shannon is entitled to a new trial under Rule 33 only if the ex parte communications affected his "substantial rights," which "are those that affect the outcome of the case." *United States v. Bishawi*, 272 F.3d 458, 462 (7th Cir. 2001); *see also* Charles A. Wright et al., 3 Fed. Prac. & Proc. Crim. § 581 (4th ed.) ("New trial motions are subject to the harmless and plain error provisions of Rule 52; if the substantial rights of the defendant were not affected, the court should refuse to grant the defendant's motion.") (citations omitted). Thus, the relevant question is whether the government's actions or inactions regarding these emails "likely affected the jury's verdict."  *Bishawi*, 272 F.3d at 462.  Given that the April 2017 email exchange with Ms. Klayer about probation's training schedule was well after the trial and none of the remaining cited emails had anything to do with Shannon's case, there is no possibility that the government's actions or inactions regarding these emails affected the jury's verdict in Shannon's case.

At bottom, Shannon's argument is that, by not disclosing these emails immediately, the government "deprived [him of] his of the right to a fair trial" before an unbiased judge.  Pet.Br. at 55.  But whether Shannon was deprived of the right to a fair trial before an unbiased judge rises or falls on whether he can prove a disqualifying bias that

overcomes the presumption that Judge Bruce presided fairly. *Franklin*, 398 F.3d at 959. Shannon cannot avoid that requirement by recasting his argument in terms of an alleged government violation of the Rules of Professional Conduct. And, for all of the reasons already articulated, Shannon is unable to demonstrate a disqualifying bias here.

## IV. No Hearing is Required to Dispose of Petitioner's § 2255 Motion

Shannon has not pleaded facts justifying either a hearing or any relief. Evidentiary hearings are not required in Section 2255 cases where there is no reason to suppose that a hearing would produce evidence justifying relief. *United States v. Taglia*, 922 F.2d 413, 419 (7th Cir. 1991). When the "motion and the files and records of the case conclusively show" that the petitioner is not entitled to the relief sought, a hearing is not required. 28 U.S.C. § 2255, *Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001). A hearing is warranted only if the petitioner alleges facts that, if proven, would entitle him to relief. *Daniels v. United States*, 54 F.3d 290, 293 (7th Cir. 1995). However, a movant under Section 2255 need not be allowed to appear in a district court for a full hearing with no regard to "how vague, conclusory or palpably incredible his allegations may be. The language of the statute does not strip the district courts of all discretion to exercise their common sense." *United States v. Farrar,* 346 F.3d 375, 376 (7th Cir. 1965) citing *Machibroda v. United States,* 368 U.S. 487, 82 S.Ct. 510 (1962).

Shannon's allegations are without merit. This Court should deny his motion without the necessity of an evidentiary hearing.

**V. Conclusion**

For the reasons stated herein, the United States respectfully requests this Court enter an order denying Shannon's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 with prejudice.

Respectfully submitted,

JOHN C. MILHISER
*United States Attorney*

By:   /S/ ELLY M. PEIRSON
*Assistant United States Attorney*
*IL Bar No. 6298075*
*201 S. Vine Street, Suite 226*
*Urbana, Illinois 61802*
*Telephone: (217) 373-5875*
*elly.peirson@usdoj.gov*

## CERTIFICATE OF SERVICE

I certify that on February 26, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Central District of Illinois by using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Elly M. Peirson
*Assistant United States Attorney*