E-FILED
Wednesday, 25 November, 2020  11:11:10 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| **SHAWN SHANNON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-cv-2233-JES** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>ORDER AND OPINION</u>

The matter is before the Court on Petitioner Shawn Shannon's Amended Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 11), which replaces his original motion (Doc. 1).  Shannon argues that he is entitled to a new trial because he received ineffective assistance of counsel, because his trial was before a biased judge, and because the United States Attorney's Office engaged in misconduct.  For the reasons below, the Court finds that a hearing on the Motion is not required because "the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." *Hutchings v. United States*, 618 F.3d 693, 699–700 (7th Cir. 2010) (quotation omitted).  Because Petitioner is not entitled to relief, the § 2255 motion is DENIED.  However, the Court will GRANT a Certificate of Appealability on the issues of whether Shannon received ineffective assistance of counsel and whether he is entitled to a new trial under the due process clause due to Judge Bruce's ex parte communications.

# I. BACKGROUND[1]

Shannon was arrested on April 15, 2015, pursuant to a criminal complaint.  R. 1, 6.  In June 2016, a grand jury in the Central District of Illinois charged Shannon in a superseding indictment of nineteen counts of sexual exploitation of a child in violation of 18 U.S.C. §§ 2251(a) and (e) and one count of distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A).  The matter proceeded to a three-day jury trial in July 2016, at which the jury returned a guilty verdict on all counts.  Kevin P. Bolger and Sami Z. Azhari represented Shannon at trial.  District Judge Colin S. Bruce presided over the criminal proceedings.  In Shannon's § 2255 Motion, he alleges his conviction should be vacated because he received ineffective assistance of counsel at trial, he did not receive a fair trial before an unbiased judge, and the United States Attorney's Office participated in Judge Bruce's unethical ex parte communications.

## A.  The Evidence Presented at Trial

Shannon's convictions stem from his relationship with J.W., a minor, and the multiple explicit photographs taken of J.W. on the night of February 28, 2015/ the early morning of March 1, 2015.  J.W.'s older cousin, Dustin Bradshaw, had met Shannon through Shannon and his family's Christian music group.  Tr.I 8.  Mr. Bradshaw introduced Shannon to J.W. and his family when J.W. was around eight years old.  *Id.*; Tr.III 70; Tr.II 159.  When J.W. was twelve years old, Shannon and J.W. began spending more time together.  Valerie Shields, J.W.'s mother, as well as J.W.'s sister, testified that J.W. was not close to his own father and needed a

---

[1] Citations to documents filed in this case are styled as "Doc. __."  Citations to the record in the underlying criminal case, *United States v. Shannon*, Central District of Illinois, Urbana Division, Case No. 15-cr-20014-001, are styled as "R.__."  The trial transcripts are cited as "Tr.I," "Tr.II," and "Tr.III" and can be found at R. 119, R. 120, and R. 121 respectively.  The final revised Presentence Investigation Report is cited as "PSR" and can be found at R. 108.

positive male role model.  Tr.I 47; Tr.II 8, 17.  Ms. Shields hoped Shannon, then forty-five years old, could fill that void in her vulnerable young son's life.  Tr.II 14-15.

By the time J.W. was thirteen years old, Shannon and J.W. began spending a considerable amount of time together.  Tr.I 48; Tr.II 209.  Shannon bought gifts for J.W., including a new iPhone, an X-Box, and clothing.  He also showed interest in J.W.'s interests and activities, including "Disney" shows.  *Id.*; Tr.II 7, 176-78; Ex. 2V.  Additionally, J.W. would help Shannon with the "Shannon Music Group," a gospel singing group that included Shannon, Shannon's parents, and Dustin Bradshaw, and occasionally would travel with them to events and help run the lights and the sound system for the shows.  Tr.II 13, 14.  Shannon gave J.W. "100 percent"; he was the minor's "confidant", "best friend", and "father figure."  Tr.II 8-9, 17, 184; Tr.I 48.  Ms. Shields trusted Shannon because he "talked in a Christian way" and he was a like a member of their family.  Tr.II 5, 14-15.  The church was important to J.W. and Ms. Shields relied on Shannon to provide her son with appropriate guidance.  Tr.II 17.  However, J.W. testified that when he would get into disagreements with his parents, Shannon would always take J.W.'s side.  Tr.II 173.  Text messages showed that Shannon even discussed how he would adopt J.W. if social welfare services intervened in their family.  Tr.II 178-81; Ex. 2C.

The government presented evidence that showed that J.W. and Shannon sent text messages to each other all day, every day.  Tr.II 10- 11, 164.  Over 7,600 text messages with Shannon were extracted from J.W.'s iPhone 5c (the phone that had been gifted to J.W. by Shannon).  Tr.II 54; Ex. 2.  These messages were exchanged between late January 2015 and March 17, 2015.  *Id.*  Many of those text messages turned to sexual banter, with Shannon discussing his interest in anal sex, masturbation, and watching pornography.  Tr.II 182, 189, 201; Ex.2F.  The two texted the secret code "P" when someone else was nearby, so that Shannon

would know not to text sexually charged messages anymore.  Tr.II 205.  J.W. testified it made him feel awkward and uncomfortable each time Shannon discussed sexual acts he wanted to do with J.W.  Tr.II 173, 195.

J.W. testified that Shannon's gifts were important to him, such that he felt pressure to comply with Shannon's sexual requests; he felt he owed Shannon something.  Tr.II 210-11, 214-215, 216; Tr.III 18; Ex. 2E, 2I.  Text messages recovered from J.W.'s phone showed that on February 28, 2015, Shannon prepared to travel to Decatur, Illinois, and spend the night in a hotel with J.W.  Ex. 2Q (text message from Shannon to victim: "what I am most excited for, seeing you and hang [sic] out with you, or seeing your dick and how much it has grown").  In text messages deleted but recovered from Shannon's iPhone 5s, as well as J.W.'s iPhone 5c, Shannon clearly described his intentions to take photographs of J.W. and engage in sexual conduct: text messages from Shannon to victim: "so if we get a room, then I want to go swimming. then we can go to room. and get naked. from there we can play with the toys. and no clothes till Sunday morning." . . . "now, can I bring the small anal toys? you want to try one?" … "and we'll take some good pics with good poses for you to give to people." . . ."I have bowling ball, but may not need it. I'll pack laptop later tonight. I have your new toy and thing of lube. I have my anal toys and my open bottle of lube. and two condoms…".  Ex. 2R, 15A.  Shannon also dyed his hair from gray to brown before he traveled.  PSR ¶256, Ex. 2R.

J.W.'s sister testified that she saw Shannon and J.W. on the day that they went to a hotel. Tr.I 49.  She had dropped her phone earlier, and Shannon was going to fix it.  *Id.*  She testified that Shannon told her "that they were going to a hotel so [Shannon] had a flat surface to work on, and they were going to swim as well."  *Id.*  J.W. testified that that he and Shannon went to a Ramada Inn after picking up the phone from his sister on February 28, 2015.  Tr.III 5, 11.

While at the Ramada Inn, the government presented evidence that Shannon sexually exploited J.W., and may have sexually assaulted him, by digitally penetrating J.W.'s anus.  Tr.III 11-12; Ex. 3A-3S, 2T ("so you didn't tell [your mom] I fingered you lmao jk"…"I'll be honest I think I put my finger in before I realized I had done it, then it was like oh well I am there now lol").  J.W. testified that he and Shannon did go to the Ramada Inn and that Shannon took nude pictures of him at the Ramada Inn that night.  Tr.III 12-13.  J.W. further testified that Shannon told him how to pose, including where to lay and put his legs.  Tr.III 12.  J.W. also testified that they watched pornography on Shannon's laptop and masturbated together at the hotel.  Tr.III 17.

At trial, the government presented evidence to refute Shannon's defense that someone else had taken the photographs and that Shannon had been framed.  Evidence showed Shannon's text messages were traceable through Shannon's cell phone provider to a cell site tower location where the messages originated, specifically Liberty Corners, Muncie, Indiana, where Shannon's residence was located.  Ex. 17A, 17B.  Forensic examiner Johnathan Bridbord from the Department of Justice's Criminal Division, Child Exploitation and Obscenity Section, compared the evidence located on J.W.'s iPhone 5c, Shannon's iPhone 5s, and evidence obtained from Apple servers and cell site location data from AT&T.  *See* Tr.III 107.  Mr. Bridbord compared text messages extracted from the victim's iPhone 5c to the text messages deleted from Shannon's iPhone 5s and found they matched.  Specifically, he compared text messages sent on February 22, 2015, and February 27, 2015, which contained details of Shannon packing for his trip to visit J.W., including packing "lube," "anal toys," and "two condoms."  Tr.III 107, 109.  Mr. Bridbord further testified that cell site location data showed that the text messages from Shannon's phone to J.W's phone were sent from the vicinity of Shannon's residence in Muncie, Indiana.  Tr.III 108-111.

This cell site location data and the text messages themselves also traced Shannon's travel from his home in Muncie, Indiana, across Central Illinois to Decatur, Illinois, and the Ramada Inn to meet J.W.  Tr.III 112-116.  Ex. 17A, 17B, 2S (text message from Shannon to victim: "almost at shell" at 3:08 p.m. CST on Saturday, February 28, 2015, cell site location, near Cisco, Illinois).  Agents matched the background and bedding of the sexually explicit images of J.W. to the exact hotel room at the Ramada Inn where Shannon stayed.  Tr.II 85; Ex. 5B.  The testimony of an expert forensic examiner, Ronald Borowcyzyk, also corroborated J.W.'s testimony that these sexually explicit images were taken with Shannon's iPhone 5s (as opposed to J.W.'s iPhone 5c7) and placed the time of one photograph as being taken at 12:53 a.m. on March 1, 2015.  Ex. 3T-1; Tr.II 77.

Shannon's iPhone 5s was seized from Shannon's presence on the day law enforcement searched his residence.  Tr.II 77; Ex. 14B.  Mr. Bridbord testified that the forensic examination showed that that in addition to deleting text messages and contacts from his device, Shannon also deleted the application program VS2 that had securely stored the pornographic images of J.W. Tr.III 135.  The forensic examination, however, revealed log entries on Shannon's iPhone 5s, that Shannon could not delete, which showed he last accessed the VS2 application at about the time he distributed child pornography on March 14, 2015.  Ex. 16F.  Mr. Bridbord also located forensic evidence that the pornographic images of J.W. were once on Shannon's iPhone 5s, even if they were deleted by the time law enforcement seized the device.  Further metadata from the images showed that they were taken with the back camera on the iPhone 5s, not the front camera used to take images of oneself or "selfies."  Ex. 3T-2; Tr.II 78.  This evidence was intended to refute the defense's theory that J.W. could have taken the sexually explicit photographs himself. Moreover, J.W.'s iPhone 5c was also visible in the photographs.  Tr.III 14, Ex. 3L, 3M, 3N.

J.W. also testified that a few months earlier Shannon had taken sexually explicit photographs of him at Shannon's residence in Muncie, Indiana.  Tr.III  19-20.  J.W. testified that he had traveled to Muncie, Indiana, for a gospel concert and he and his cousin Dustin Bradshaw stayed over at Shannon's house.  Tr.III 21.  J.W. testified that after Dustin Bradshaw went to sleep, he and Shannon went into Shannon's room to watch pornography and masturbate together.  Tr.III 21.  J.W. further testified that Shannon took sexually explicit photographs of him with Shannon's iPhone 5s.  Tr.III 22.  Mr. Borowczyk testified that he found additional sexually explicit images of J.W. that were sent via text message from Shannon to J.W. on March 14, 2015.  Tr.II 93.  The cell site location for the origination of these text messages was also in Liberty Corners, Muncie, Indiana, consistent with the location of Shannon's residence.  Ex. 17A, 17B.  The agent also testified that a Dell laptop visible in the photographs was the same laptop that was recovered from Shannon's house, and that the bedspread and other items in the room matched the bedspread and other items in Shannon's bedroom at his residence.  Tr.II 95, 102.  Additional images, other than the one sent on March 14, 2015, were recovered from J.W.'s iPhone.  Agent Ronald Borowczyk testified that the metadata showed that the files were taken on October 24, 2014.  Tr.II 98.

On March 17, 2015, J.W.'s mother, Ms. Shields, found the sexually explicit messages and photographs on J.W.'s phone.  She informed Dustin Bradshaw of what she found and went to the police that same day.  Dustin Bradshaw sent a text message to Shannon informing him that Ms. Shields had found naked photographs of J.W. that were sent to J.W. from Shannon.  Tr.III 82.[2]  Shannon then sent text messages to both Dustin Bradshaw and Ms. Shields admitting guilt.  Ex. 15A (text message from Shannon to Dustin Bradshaw: "he asked me to take for his girlfriend

---

[2] Dustin also testified that he lived "about three and a half hours away" from Shannon's residence in Muncie, Indiana.  Tr.III 71.

at the time."), Ex. 1A, 1B, 1C (text message from Shannon to Ms. Shields: "hey, Dustin just told me. I am sorry about taking pictures for [J.W.].  He asked […]I thought of him as an adult").
The cell site location for these admissions was in Liberty Corners, Muncie, Indiana.  Ex. 17A, 17B.  Importantly, Ms. Shields had a Samsung phone, which functions in the Android (as opposed to Apple) operating system.  Tr.II 31.  Therefore, the apologetic messages sent to her phone were SMS messages (as opposed to iMessages), meaning they could only have been sent from Shannon's phone, and not from another Apple device.  When married with the cell site location data from AT&T, they show Shannon was at his residence in Muncie, Indiana, when he confessed to these crimes.  The jury saw the text messages to Ms. Shields, which were captured by a Decatur Police officer on the day she reported the crimes to them.  Ex. 1A, 1B, 1C.  The jury saw forensic artifacts recovered from Shannon's iPhone 5s, that showed these SMS messages were deleted from this phone.  Ex. 15A.  And the jury saw the AT&T records for these calls from which the forensic examiner mapped the cell site location to the vicinity of Shannon's residence.  Ex. 17A.  Moreover, shortly after sending the apology messages Shannon began deleting evidence on his iPhone, including the thousands of messages between him and J.W.  Tr.II 11, 127-128.

The government also addressed Shannon's claim that another Apple device could have sent the iMessages.  The forensic examiner, Mr. Bridbord, testified that any time a new device uses an Apple ID registered to another device a notification is sent to the user of the original device.  Tr.III 141.  In addition, a log entry is made on the original device to document such notification.  *Id*.  The jury heard that no log entries were found on Shannon's iPhone 5s to indicate that any other device remotely logged into his Apple ID.  *Id*.  Notwithstanding

Shannon's theory of the case, neither forensic examiner found evidence that anyone other than Shannon committed the crimes against J.W.  Tr.II 155; Tr.III 150.

Finally, to further refute Shannon's defense that someone else used his Apple ID and committed these crimes, the government presented evidence, recovered from another older iPhone (model 3) seized from Shannon's residence.  This device contained text messages and images involving another minor victim, A.W., to whom Shannon sent pornographic images of himself, including full-body images.  Ex. 12A-12H; Ex 13A13K.  The evidence presented showed that Shannon enticed and coerced A.W. into producing child pornography and engaged in abusive sexual contact with A.W.  Tr.III 41-59; Ex. 13A-13K.  A.W. testified that he began talking to Shannon on about December 31, 2009, when he was sixteen years old.  Tr.III 42.  Text messages provided evidence that Shannon likely knew A.W. was a minor.  Tr.III 43.

After the government rested, the defense called no witnesses and Shannon chose not to testify.  The jury found Shannon guilty of all nineteen counts of sexual exploitation of a child in violation of 18 U.S.C. §§ 2251(a) and (e), and one count of distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A).  R. 67, Verdict.

## B. Post-Trial Proceedings

After the trial, counsel filed a Motion for New Trial.  R.71.  In denying the Motion, Judge Bruce noted that:

> Although the court states that the motion is "fully briefed," it notes that this designation may be too generous to Defendant considering the fact that his short (slightly over one page) briefing was mostly allegations with little or no factual support and absolutely no analysis. Although it appears Defendant's counsel spent little time on the motion, the court was forced to allocate scant judicial resources and sufficient time to appropriately address Defendant's bare and unsupported contentions.

R. 77.

The matter proceeded to sentencing, but Shannon's trial counsel withdrew from the case, and the Federal Public Defender's office was appointed.  R. March 31, 2017 Minute Entry.  The United States Probation Office prepared a second revised Presentence Investigation Report on September 6, 2017.  The PSR concluded that Shannon had a total offense level of 43 and a criminal history category of I, resulting in a guidelines imprisonment range of life.  PSR ¶ 276.  However, pursuant to 18 U.S.C. §§ 2251(a) and (e), each of Counts One to Nineteen had a minimum term of imprisonment of fifteen years imprisonment and a maximum term of thirty years, and pursuant to 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), the minimum term of imprisonment for Count Twenty was five years and the maximum term was twenty years.  Accordingly, the PSR found that the guideline range is 7,080 months' imprisonment, consisting of 360 months on each of Count One through Nineteen and 240 months on Count Twenty, all to run consecutively.  PSR ¶ 277.

At the sentencing hearing on September 11, 2017, Judge Bruce departed significantly downward from the guidelines and sentenced Shannon to a total of only 720 months' imprisonment.  R. Minute Entry Sept. 11, 2017.  The judgment issued on September 13, 2017.  R. 112.  Shannon did not appeal his sentence or conviction.

## C.  Discovery of Ex-Parte Communications Between Judge Bruce and the United States Attorney's Office.

As stated above, United States District Judge Colin S. Bruce presided over Shannon's criminal proceedings.  For the purposes of this Opinion, the Court assumes the reader's familiarity with the facts surrounding Judge Bruce's ex parte communications with the United States Attorney's Office for the Central District of Illinois ("the Office").  These facts have been comprehensively discussed and analyzed by the Seventh Circuit Judicial Council and the

Seventh Circuit Court of Appeals, and are recounted here only in a summary fashion.  *See In re Complaints Against Dist. Judge Colin S. Bruce*, Nos. 07-18-90053, 07-18-90067 (7th Cir. Jud. Council May 14, 2019) (available at http://www.ca7.uscourts.gov/judicial-conduct/judicial-conduct_2018/07_18-90053_and_07-18-90067.pdf); *United States v. Williams*, 949 F.3d 1056 (7th Cir. 2020); *United States v. Atwood,* 941 F.3d 883 (7th Cir. 2020).

Prior to his appointment to the judiciary, Judge Bruce worked in the Office in Urbana, Illinois, in the Central District of Illinois for twenty-four years.  In August 2018, a newspaper reported that Judge Bruce had engaged in ex parte communications with the Office regarding the criminal trial of *United States v. Nixon,* a case he was presiding over.  In the emails to a paralegal at the Office, Judge Bruce criticized a novice prosecutor, complaining that her weak cross-examination had turned the case "from a slam-dunk for the prosecution to about a 60-40 for the defendant," and called the defendant's testimony "bullshit."  Upon learning of the emails, the undersigned, in my capacity at the time as Chief District Judge, removed Judge Bruce from all cases involving the Office.  *See Williams*, 949 F.3d at 1059.

The Office conducted a search of its email archives between Judge Bruce's chambers and the Office, finding over one-hundred ex parte communications.  One of these communications concerned the *Shannon* case, and was disclosed to Shannon's counsel on September 19, 2018.  The email was between Paralegal Specialist Staci Klayer and Judge Bruce.  In the email string, a probation officer informed the court and the relevant parties—including Judge Bruce, Urbana Branch Supervisor AUSA Eugene Miller, Ms. Klayer, clerk's office personnel, the magistrate judge, and another district court judge—that the probation office would be unavailable for hearings on September 11 and 12, 2017.  Judge Bruce, replying to all of the addressees, stated, "Shawn Shannon re-sentencing set for September 11. Nice."  Pet. Ex, E (Doc. 14-2).  Ms. Klayer

then replied solely to Judge Bruce, writing, "Sounds like the probation officer assigned to this

case needs to stay here and work," and Judge Bruce responded, "Yep. Don't think its [sic]

moving……" *Id.*

Like the communication related to Shannon's case, the majority of the emails addressed

ministerial matters.  However:

> they often showed Judge Bruce cheering on Office employees and addressing
> them by nicknames. For example, Judge Bruce corresponded ex parte with a
> secretary in the Office about scheduling for Atwood's co-defendant, writing,
> "Roger-dodger. GO SONCHETTA [a nickname for the secretary]!" And after a
> pretrial conference, Judge Bruce reassured a prosecutor about a filing
> miscommunication: "My bad. You're doing fine. Let's get this thing done." At
> other times, Judge Bruce wrote to prosecutors in the Office to congratulate and
> thank them for persuading [the Seventh Circuit] to affirm his decisions.

*Atwood,* 941 F.3d at 885.

After Shannon filed his § 2255 Motion and after the government filed its response, the

Judicial Council of the Seventh Circuit reviewed two complaints filed against Judge Bruce.  A

Special Committee was appointed by Chief Judge Diane P. Wood to investigate the complaints.

After conducting interviews and a hearing, the Special Committee issued a report and

recommendations, which were adopted in full by the Judicial Council of the Seventh Circuit.  *In

re Complaints Against Dist. Judge Colin S. Bruce*, Nos. 07-18-90053, 07-18-90067 (7th Cir. Jud.

Council May 14, 2019).  The Judicial Council publicly reprimanded Judge Bruce for his practice

of ex parte communications and found it violated Canon 3(a)(4) of the Code of Conduct for

United States Judges.  *Id.*  Judge Bruce was also ordered to remain unassigned to matters

involving the Office until September 1, 2019.  *Id.*  However, the Judicial Council "identified no

evidence suggesting that Judge Bruce's ex parte contact or relationship with the U.S. Attorney's

Office in the Central District of Illinois impacted his decision making in any case."  *Id.*  Further,

with the exception of the *Nixon*-related and appeal-related emails, the Special Committee saw

"no evidence of Judge Bruce discussing the merits of pending cases with the Office ex parte."

*Id.*

### D.  Shannon's § 2255 Motion

Shannon filed this Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 on September 17, 2018 (Doc. 1), alleging his trial counsel provided ineffective assistance of counsel.  After learning of Judge Bruce's ex parte email communications, Shannon sought leave to file an amended motion.  His Amended Motion (Doc. 11) was filed on January 22, 2019.  In addition to his ineffective assistance of counsel claim, Shannon argues he is entitled to relief because he did not receive a fair trial before an unbiased judge, and because the government failed to disclose evidence of ex parte communications.  The government filed its response on February 26, 2019 (Doc. 17).  Shannon filed a reply on July 28, 2019 (Doc. 26).

While Shannon's motion remained pending, the Seventh Circuit addressed two cases bearing on Judge Bruce's ex parte communications.  *See United States v. Williams*, 949 F.3d 1056 (7th Cir. 2020), *United States v. Atwood,* 941 F.3d 883 (7th Cir. 2019).  Shannon sought leave to file a supplemental brief addressing the impact of these cases, which he did on May 7, 2020 (Doc. 28).  The government filed a response on June 8, 2020 (Doc. 30).  Shannon filed a second supplemental brief (Doc. 32) on November 2, 2020, addressing the Seventh Circuit's decision in *United States v. Orr*, 969 F.3d 732 (7th Cir. 2020), and clarifying his intent to also bring a claim under the federal recusal statute 28 U.S.C. § 455(a).  The government was permitted to file a response, if desired, on or before November 16, 2020, but has declined.

## II.  LEGAL STANDARD

A person convicted of a federal crime may move to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  Relief under § 2555 is an extraordinary remedy because

a § 2255 petitioner has already had "an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). A petitioner may avail himself of § 2255 relief only if he can show that there are "flaws in the conviction or sentence which are jurisdictional in nature, constitutional in magnitude or result in a complete miscarriage of justice." *Boyer v. United States*, 55 F.3d 296, 298 (7th Cir. 1995), *cert. denied*, 116 S. Ct. 268 (1995).

Section 2255 is limited to correcting errors that "vitiate the sentencing court's jurisdiction or are otherwise of constitutional magnitude." *Guinan v. United States*, 6 F.3d 468, 470 (7th Cir. 1993) (citing *Scott v. United States*, 997 F.2d 340 (7th Cir. 1993)). A § 2255 motion is not a substitute for a direct appeal. *Doe v. United States*, 51 F.3d 693, 698 (7th Cir. 1995), *cert. denied*, 116 S. Ct. 205 (1995); *McCleese v. United States*, 75 F.3d 1174, 1177 (7th Cir. 1996). However, "it is generally proper to raise arguments of ineffective assistance of counsel for the first time on collateral review in a § 2255 petition because such claims usually. . . involve evidence outside the record." *Galbraith v. United States*, 313 F.3d 1001, 1007 (7th Cir. 2002).

### III. DISCUSSION

#### A. Shannon's Ineffective Assistance of Counsel Claim is Denied and An Evidentiary Hearing is Unnecessary.

Shannon's first ground for relief is that his trial counsel provided ineffective assistance. The Sixth Amendment guarantees criminal defendants effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984). Under *Strickland's* familiar two-part test, a petitioner must show both that his attorney's performance was deficient and that he was prejudiced as a result. *Vinyard v. United States*, 804 F.3d 1218, 1225 (7th Cir. 2015). In addressing performance, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 690. To prove prejudice, a petitioner must show that there is "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one undermining the court's confidence in an outcome. *Id.*

"When evaluating an ineffective assistance of counsel claim, the Court should 'address each specific contention of defective performance separately. We then turn to the question of prejudice, which we assess by evaluating the trial as a whole, not one slip at a time.'" *Cook v. Foster*, 948 F.3d 896, 901 (7th Cir. 2020); *Myers v. Neal*, 975 F.3d 611 (7th Cir. 2020) ("Where, as here, the record shows more than one instance of deficient performance, the Sixth Amendment requires that we approach the prejudice inquiry by focusing on the cumulative effect of trial counsel's shortcomings."). Absent a sufficient showing of both cause and prejudice, a petitioner's claim must fail. *United States v. Delgado,* 936 F.2d 303, 311 (7th Cir. 1991). Therefore, the Court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

As an initial matter, Shannon has requested an evidentiary hearing on his claim. "A hearing is required when 'a petitioner alleges facts that, if true, would entitle him to relief.' . . . But a judge may deny a hearing if the petitioner's allegations are 'too vague and conclusory,' or if 'the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Day v. United States*, 962 F.3d 987, 992 (7th Cir. 2020) (citing *Torres-Chavez v. United States*, 828 F.3d 582, 586 (7th Cir. 2016); 28 U.S.C. § 2255(b)). Here, Shannon claims counsel was deficient for failing to present evidence of motive and opportunity for Dustin Bradshaw to commit the crime instead of him and failing to investigate and understand Apple Technology.

To this end, Shannon points to multiple pieces of evidence and available witnesses that could have bolstered this defense.  Moreover, Shannon claims that trial counsel should have objected to and could have prevented the admission of the testimony of A.W., which bolstered the government's theory of the case, and that trial counsel was generally deficient for failing to communicate with Shannon and write substantive motions in his defense.  Here, a hearing may be necessary to determine whether Shannon's counsel's performance was deficient in certain instances.  Shannon boldly claims that the totality of the evidence and testimony he argues should have been introduced at trial "establishes [Shannon's] innocence of the crimes of which he was accused."  Pet. Memo. at 7 (d/e 11).  However, a review of the totality of the evidence presented by the government shows this is far from the case.  And, as explained below, the Court finds that Shannon has not shown that he suffered prejudice even assuming the facts Shannon alleges in his motion are true, because, while Shannon has highlighted a number of instances where counsel was allegedly deficient, he cannot show he suffered any prejudice as a result of these errors in light of the overwhelming evidence against him.

Shannon first claims that trial counsel should have introduced evidence given to him by Shannon and/or his parents, as well as called witnesses, that would have showed Dustin Bradshaw had "motive and opportunity to pose as [Shannon] engaging in sexually explicit iMessaging and taking nude photos of a minor."  Amend. Memo. at 13 (Doc. 12).  Shannon points to a copy of an email that had been provided to trial counsel and allegedly sent by Dustin Bradshaw to Wilma Shannon, Shannon's mother on February 19, 2015.  In that email Dustin Bradshaw says:

> I don't know how you will take this but I talked to Shawn and he is on me to
> return his stage lights. I told him I am not returning them I need them and he
> don't.  I want this to stop him asking for them back or he is going to be sorry. . .  I
> am sick of this and it better stop or I will see that he [Shawn] loses everything and

> I know how do it. I think I am being nice about this because I could come when he isn't home and take what I need. I have keys to his house and all his passwords for his computers phone and things so don't underestimate me [sic] what I can do. You better talk to him or I will take matters in my own hands and it won't be good for him or you guys. Dustin

Pet. Ex. 2 (Doc. 14-1 at 5).  Additionally, Wilma Shannon also gave trial counsel a copy of a Facebook message she states is from Dustin Bradshaw in which he says:

> Wilma and James. I know you don't care to hear from me. However, when I contacted you guys last year and Shawn got upset with me he put my iPad on lost mode which locked me out of it completely. This is the iPad that I bought after my house was broken into. It took me a year to find the original proof of purchase. I again contacted apple and they can't do anything without the password to the Apple ID shawn@theshannons.com. I also asked the attorney about this issue and they wanted me to ask politely if you would give me the information for this iPad so I can open it up and get his id off of it. If not I will have to get a court order for Apple to do it. Thanks.

Pet. Ex. 3 (Doc. 14-1 at 6).  Shannon claims trial counsel was informed by Shannon or his parents that Dustin Bradshaw had "Stolen equipment and digital devices from Shannon and that Shannon and his family were taking steps to get those items back."  One of these items was an iPad with Shannon's Apple ID.

Shannon also alleges that trial counsel should have called multiple witnesses that would have supported Shannon's defense theory that he was framed by Dustin Bradshaw and J.W.  These witnesses are:

(1) Dean Jones, who would have allegedly testified regarding an incident where an underaged member of his church had presented him with nude photographs of Mr. Bradshaw that were sent to her by Mr. Bradshaw and that Mr. Bradshaw had accused him of inappropriate contact with a church member;

(2) Wilma Shannon, who would have testified regarding the email and Facebook message mentioned above and would have testified that Dustin Bradshaw had stolen equipment

and digital devices from Shannon, including an iPad which was set up with Shannon's Apple ID.

(3) James Shannon, who would also have testified regarding the email and Facebook message from Dustin Bradshaw and the allegedly stolen equipment, and would have testified that he was with Shannon and J.W. on February 28, 2015, at the Ramada Inn (the night the sexually explicit images were taken); and

(4) Dee Topper, who would have testified that Dustin Bradshaw changed the name of an event called "The Shannon's Gospel Rally" shortly before Shannon's arrest—but *after* J.W. and his mother had gone to the police with the evidence against Shannon—and told her that The Shannon's would no longer be performing at the event.

At trial Dustin Bradshaw testified that his iPad shared music with Shannon's Apple account, but nothing else, and that he never used it to send text messages. Tr.III 95. Trial counsel did not cross examine Dustin Bradshaw regarding the communications allegedly sent to Shannon's parents or seek to introduce any of these witnesses.

Shannon was proceeding with a defense that Dustin Bradshaw was the one who took the photographs and sent the text messages. Presenting credible evidence that Dustin Bradshaw had a motive or opportunity to do so should have been a priority for trial counsel to make Shannon's defense seem plausible. He also needed to provide a reason for the jury to doubt J.W.'s testimony and a reason that J.W. would have participated in this conspiracy. In his affidavit, Shannon's trial counsel states he made a deliberate choice not to call the majority of these witnesses. *See* Declaration of Kevin P. Bolger, Resp. App., (Doc. 17-1 at 141) ("I thoroughly investigated the facts and the law and made strategic reasons for not calling Wilma and James Shannon, Dee Topper, and Dean Jones. Specifically their testimony would either not have any

relevance to the defense's theory of the case, were inadmissible under the rules of evidence, would have suborned perjury or would have opened a line of questioning by the prosecution that would have been detrimental to my client."); *see also* Amend. Memo at 1 (Doc. 12) ("Shawn's attorney declined at trial to present evidence that was readily available. Shawn and Shawn's family provided Shawn's attorney with relevant information and names of witnesses whose testimony would have assisted his defense.").  While "a failure to investigate can certainly constitute ineffective assistance," *Adams v. Bertrand*, 453 F.3d 428, 436 (7th Cir. 2006), "[i]f counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005).  Strategic decisions like these, so long as they are made after a thorough investigation of law and facts, are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.  Trial counsel's affidavit is certainly sparse as to his reasoning, however, when it comes to strategic choices such as the decision to call witnesses, the Court's review must be highly deferential.

    Regardless, the failure to admit this testimony was not prejudicial because this evidence would not have made Shannon's defense plausible in light of the government's overwhelming evidence refuting Shannon's defense.  James Shannon's testimony that he was at the Ramada Inn on the night the photographs were taken combined with the evidence of Dustin Bradshaw's motive and opportunity evidence, on its own, certainly presents an alternative picture from J.W.'s account.  However, even without considering the forensic evidence, the idea that Dustin Bradshaw concocted an elaborate conspiracy to frame Shannon solely because he wanted to take over the Shannon's musical group and steal musical equipment and that he sent roughly 7,600 text messages to J.W. without Shannon himself sending any on the phone he bought J.W. is far-fetched to say the least.

James Shannon's testimony that he was at the Ramada Inn with Shannon and J.W. the night the photographs were taken also would have contradicted J.W.'s testimony. However, James Shannon alleges that he fell asleep around 1 a.m. when J.W. was texting on his phone and he did not see any photographs being taken. This testimony, if believed, would certainly have caused confusion about what happened and may have called into question J.W.'s recitation of events. However, looking at the whole trial picture, James Shannon's testimony, even if the jury found it credible, would not have had a reasonable probability of impacting the case. Notably, James Shannon's testimony would put Shawn Shannon at the hotel with J.W. The undisputed government expert testimony shows that the images were taken the night of February 28, 2015/ the early morning of March 1, 2015 at the Ramada Inn, that one of the photographs was taken at 12:53 a.m. on March 1, 2015 (right around the time James Shannon recalls falling asleep), that the photographs were taken by an iPhone 5s, and that J.W. himself did not take the photographs. If James Shannon's account is credited, it is still true that *someone* took the photographs of J.W. at the Ramada Inn after James Shannon fell asleep. Even if the jury was hesitant to believe J.W., there is no reason to believe that the *someone* who took the photographs was anyone other than Shannon in light of the government's forensic evidence.

Shannon claims, however, that trial counsel should have objected to the government's experts and forensic evidence and researched Apple technology himself, which he argues would have undermined the forensic evidence. Specifically, Shannon claims that trial counsel could have turned to Logan Richardson, an Apple Certified iOS Technician with five years of experience to support Shannon's defense. *See* Pet. Ex. C, Declaration of Logan Richardson (Doc. 14-1 at 12-15). Mr. Richardson states that, in his opinion, it was possible that another

device linked by his Apple ID could have actually sent the iMessages and photographs.  *Id.*  He further states:

> It is also possible that Mr. Shannon would not have known about the messages and pictures even though the iMessages were sent to and from his Apple ID. In this case, as there were multiple devices utilizing the Shawn@TheShannons.com Apple ID, it is possible another device had conversations and it is possible that only that device was seeing these conversations, as they may not have been enabled on the device, an iPhone, that Mr. Shannon had in his possession and consistently used."

*Id.*

While Shannon's expert posits that it is possible another Apple device could have sent the iMessages and photographs, and Shannon's other witnesses would have provided evidence of a theoretical motive, this testimony does not address the additional evidence that makes the *possibility* that Dustin Bradshaw framed Shannon highly implausible and possibly impossible. For example, the government presented cell site location data tying explicit text messages regarding Shannon's intentions to engage in sexual behavior at the hotel on the night of February 28, 2015 to Shannon's house.  The cell site location data also tied other text messages to Shannon's house and showed Shannon was in control of his own phone.  Perhaps most damaging to Shannon's defense, the government presented the apology text message that was sent to J.W.'s mother as an SMS message to a non-Apple device, meaning the message had to have come from Shannon's iPhone 5s.  Tr.II 31.; Ex. 1A, 1B, 1C (text message from Shannon to Ms. Shields: "hey, Dustin just told me. I am sorry about taking pictures for [J.W.].  He asked […]I thought of him as an adult").  In text messages deleted but recovered from Shannon's iPhone 5s, and found on J.W.'s iPhone 5c, Shannon clearly described his intentions to take photographs of J.W. and engage in sexual conduct.  *See* Ex. 2R, 15A (text messages from Shannon to victim: "so if we get a room, then I want to go swimming. then we can go to room. and get naked. from there we can

play with the toys. and no clothes till Sunday morning." . . . "now, can I bring the small anal toys? you want to try one? "…"and we'll take some good pics with good poses for you to give to people." . . ."I have bowling ball, but may not need it. I'll pack laptop later tonight. I have your new toy and thing of lube. I have my anal toys and my open bottle of lube. and two condoms…").  These messages and others were deleted off of Shannon's iPhone shortly after the SMS apology text was sent —making Shannon's allegations that he could have been oblivious the iMessages were being sent even more incredible.  Shannon also deleted the secure file application VS2 that had securely stored the pornographic images shortly after sending the apology text and forensic evidence showed that Shannon accessed VS2 on his iPhone 5s at about the time the images were sent.  The list could go on, but the forensic evidence at trial thoroughly addressed and foreclosed Shannon's defense that someone else took the photographs and someone else sent all the messages and photographs unbeknownst to Shannon in this case.

    Shannon argues that an evidentiary hearing is needed to address Mr. Richardson's opinions and determine his credibility as an expert.  This may be true.  But, even assuming Mr. Richardson's credibility, the Court finds that his expert opinion only relates to the potential to send iMessages from other AppleID-connected devices, and does not attempt to address cell site location data or the other forensic data.  Notably, Shannon's reply does not contend that Mr. Richardson's expert affidavit was intended to address anything other than the potential for iMessages to come from other Apple ID connected devices: "Mr. Richardson's was able to state that Mr. Shannon possibly had no participation in sending sexually explicit *iMessages* and photos in this case, Dustin Bradshaw had the ability to pose as Shawn Shannon and send the sexually explicit *iMessages* and photos to J.W. and that Shawn Shannon could have been completely unaware of this communication."  Reply at 8-9 (d/e 26) (emphasis added).

Moreover, as the government points out, Shannon's expert's affidavit even supports the fact that the apology SMS message sent to J.W.'s mother must have come from Shannon's iPhone, as opposed to another Apple ID connected device. *See* Pet. Ex.C at 3 ("Text messages, however, are only sent from the phone number associated with the device, and that cannot be copied or eliminated from a device connected to the phone number without intervention from the cellular company being used.").

Shannon also argues an evidentiary hearing is needed because his expert was only able to review the transcripts of the two expert witnesses called by the government, Mr. Johnathan Bridbord and Mr. Ronald Borowczyk, but did not review any of the forensic artifacts because the government refused to turn over this information to post-conviction counsel. However, Shannon has not sought any discovery in his § 2255 proceeding, as is allowed under Rule 6 of the Rules Governing Section 2255 Cases in the United States District Courts, nor has he attempted to argue, via an expert affidavit or otherwise, what he could gain by obtaining such discovery. An evidentiary hearing would not help him obtain this discovery either. Rather, an evidentiary hearing could only help Shannon show that his trial counsel's performance was deficient if trial counsel did not attempt to understand and investigate this discovery himself. To show prejudice, Shannon would need to show that trial counsel could have uncovered expert evidence to explain the viability of his defense in light of the forensic data or otherwise explain how or why the government's experts' analyses were incorrect or unreliable. Shannon has not submitted any proof that he can do so. "[M]ere speculation" does not warrant an evidentiary hearing, rather Shannon was required to "file detailed and specific affidavit showing he has actual proof of allegations he is making." *Miller v. United States,* 183 Fed. Appx. 571, 578 (7th Cir. 2006).

And, without any basis to call into question the government's expert or the forensic data, pinning the crime on Dustin Bradshaw (or anyone other than Shannon) is beyond implausible and would need to involve AT&T and forensic examiners participating in this conspiracy as well.  There is not a reasonable probability that the jury would have believed such an extensive conspiracy would exist, let alone that it was orchestrated to obtain music equipment and "take over" a music festival.

Further, while Shannon takes issue with trial counsel for making statements that he believes bolstered the credibility of the government's experts, the Court does not find they could have caused any prejudice either.  Shannon highlights three statements trial counsel made.  First, when the government moved to qualify Detective Borowczyk as an expert in the examination of digital devices, trial counsel responded, "Judge, he sounds qualified to me."  Tr.III 47.  Second, Trial counsel's first question in his cross-examination started with the statement, "I think after court today, I'm going to destroy all my mobile devices." Tr.III 142.  And third, in closing arguments, Shannon's trial counsel, argued, "Now, we had all this expert testimony and everything.  And I wasn't kidding. After hearing all that, I don't even want to talk on the phone anymore."  Tr.III 223.  Shannon argues that these statements reinforced the credibility of the government's expert witnesses and the strength of the government's case, and implied that Shannon was guilty of these crimes.  However, again, given the overwhelming evidence against Shannon, these comments could not have caused any prejudice to him.  On the contrary, trial counsel speaking favorably of the experts—whose credibility Shannon has not presented the Court any reason to doubt—may have helped trial counsel appear more credible and help sway the jury into believing room for Shannon's defense existed despite the experts' testimony.

The Court also notes that both Wilma and James Shannon's affidavits mention their knowledge and opinions of J.W.'s mental health.  The court could and should have restricted the cross examination of a witness, particularly a minor victim, that was intended only to harass, humiliate and embarrass the witness or victim.  *Delaware v. Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435; 18 U.S.C. § 3771(a)(8) and (b)(1)(the Crime Victims' Rights Act requires that the court "ensure that the crime victim is afforded" the right to be "treated with fairness and with respect for the victim's dignity and privacy.").  Additionally, Shannon points to evidence that J.W. was having a text message conversation with another individual on the night the nude photographs were taken that was provided to counsel prior to trial.  However, the Court can find no relevance to the fact that J.W. may have been having a text message conversation with another individual on the night the nude photographs were taken.  Indeed, the photographs themselves show that J.W. had his phone with him when the photographs were taken.  Counsel's performance is not deficient for failing to present irrelevant and/or inadmissible evidence.  Further, even if this evidence had been presented at trial, Shannon has not explained how it would have impacted the trial and the Court finds that it would not have had any impact.

The Court reaches the conclusion that the failure to present this evidence, call the listed witnesses, and investigate Apple technology did not cause any prejudice to Shannon even without considering the testimony of A.W.  With A.W.'s testimony, of course, the government's case becomes even more overwhelming.  Shannon is correct that trial counsel should have argued against admitting A.W.'s testimony, which had the potential to prejudice the jury against Shannon.  However, any failing by trial counsel is only prejudicial if exclusion of the testimony was a reasonable probability.  The Court finds that the testimony was properly admitted and Shannon's arguments do not show a reasonable probability that the testimony could have been

excluded.  Shannon does not argue that the government's pre-trial notice should not have been granted, but instead argues that the evidence at trial differed from what was presented in the government's pre-trial notice and should not have been admitted.  The government introduced evidence of Shannon's previous sexual relationship with minor victim A.W. pursuant to Federal Rule of Evidence 404(b).  While "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," F.R.E. 404(b)(1), this evidence can be used for other purposes.  Rule 404(b)(2) outlines the permitted uses of "other act" evidence:

> **Permitted Uses; Notice in Criminal Case.** This evidence may be admissible for another purpose, such as providing motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
>
> > (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
> >
> > (B) do so before trial-or during trial if the court for good cause, excuses lack of pretrial notice.

F.R.E. 404(b)(2).  To determine whether to admit evidence under Rule 404(b), courts analyze whether:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Sebolt*, 460 F.3d 910, 916 (7th Cir. 2006) (quoting *United States v. Price,* 418 F.3d 771, 783–84 (7th Cir. 2005)).

The government argues that A.W.'s testimony was properly admitted because Shannon advanced a defense that he was framed and did not engage in sexually explicit conduct with J.W.

Under Rule 404(b), other acts evidence could be admitted if the alleged encounter could "be considered a prior instance of sexual misconduct with a child victim that would establish [Shannon's] interest in children." *See also, Sebolt*, 460 F.3d at 917 (internal citation omitted) ("Prior instances of sexual misconduct with a child victim may establish a defendant's sexual interest in children and thereby serve as evidence of the defendant's motive to commit a charged offense involving the sexual exploitation of children. . . . It also may serve to identify the defendant to the crime.").  Shannon argues that A.W.'s testimony does not fall under this category because the testimony shows that Shannon "clearly did not entice a minor to produce child pornography as claimed by the government in their notice."  Rather, the evidence could only show that Shannon "was a homosexual and seeking sexual interaction with a young adult male," which he argues does not directly address identity, motive, or intent to commit the crimes charged in the indictment.  However, A.W.'s testimony was that he sent sexually explicit pictures of himself at Shannon's request when he was a minor.  *See, e.g.,* Tr.III 52-54. Accordingly, the Court finds that this testimony provided evidence of a "prior instance of sexual misconduct with a child victim," and addressed his motive and identity for the charges in his case.  And, as the government points out, that Shannon allegedly mistakenly believed that A.W. was 18 years of age is irrelevant because mistake of age is not a defense under 18 U.S.C. § 2251. *United States v. Fletcher*, 634 F.3d 395 (7th Cir. 2011).

Moreover, Shannon could have presented this issue on appeal if he believed that Judge Bruce's ruling was incorrect.  Trial counsel did move to exclude this evidence and, while trial counsel's motion may not have been well-written, Judge Bruce's order allowing the evidence fully addressed all the relevant factors.  An appeal would have been an adequate remedy to challenge the merits of this decision.  In reply, Shannon provides no reason for failing to appeal

or as to why an appeal would have been insufficient.  Accordingly, the Court finds that any deficient performance of trial counsel in failing to adequately object to this evidence did not cause Shannon any prejudice.

Finally, Shannon also alleges that trial counsel was generally ineffective for advising him to plead guilty, for failing to prepare for a trial, for failing to discuss the case significantly with Shannon, and for filing an insufficient motion for a new trial.  Shannon claims trial counsel was ineffective for not preparing Shannon to testify.  Shannon does not elaborate on how any of these alleged general failings impacted his case or what trial counsel should have done differently. Broad unsupported claims of ineffective assistance of counsel without a showing of prejudice are insufficient to show ineffective assistance of counsel.  *See, e.g., Hurlow v. United States*, 726 F.3d 958, 964 (7th Cir. 2013) (citing *Jones v. United States,* 167 F.3d 1142, 1144–45 (7th Cir. 1999)).  Accordingly, the Court does not find that these grounds support Shannon's claim of ineffective assistance of counsel either.

Therefore, the Court finds that Shannon has not shown that his trial counsel provided constitutionally ineffective assistance of counsel.  Moreover, no evidentiary hearing is needed because, even assuming all of Shannon's allegations are correct and all of his witnesses are credible, he has failed to show any prejudice given the overwhelming and uncontradicted evidence of his guilt.  Accordingly, Shannon's claim of ineffective assistance of counsel is denied.

### B.  Shannon's Due Process Right to a Fair Trial Before an Unbiased Judge Was Not Violated.

Shannon next alleges he did not receive a fair trial before an unbiased judge in light of Judge Bruce's ex parte communications in violation of his due process rights.  "Due process

guarantees 'an absence of actual bias' on the part of a judge." *Williams v. Pennsylvania*, 136 S.

Ct. 1899, 1905 (2016) (citing *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623 (1955)).  A trial

before a biased judge is a structural error and not subject to the harmless error analysis.  *Tumey v.*

*Ohio*, 273 U.S. 510, 535 (1927).  "[T]he Due Process Clause may sometimes demand recusal

even when a judge 'ha[s] no actual bias.'  Recusal is required when, objectively speaking, 'the

probability of actual bias on the part of the judge or decisionmaker is too high to be

constitutionally tolerable.'"  *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017) (*Aetna Life Ins. Co. v.*

*Lavoie,* 475 U.S. 813, 825, 106 S. Ct. 1580 (1986)).

 However, "most matters relating to judicial disqualification d[o] not rise to a

constitutional level.'"  *Suh v. Pierce*, 630 F.3d 685, 691 (7th Cir. 2011) (quoting *FTC v. Cement*

*Institute*, 333 U.S. 683, 702 (1948)).  The analysis begins with presuming "the honesty and

integrity of those serving as adjudicators."  *Del Vecchio v. Illinois Dep't of Corr.*, 31 F.3d 1363,

1375 (7th Cir. 1994) ("Disqualification is required only when the biasing influence is strong

enough to overcome that presumption, that is, when the influence is so strong that we may

presume actual bias.") (internal citations omitted).  Disqualifying influences are those that strike

"at the heart of human motivation, that an average man would find it difficult, if not impossible,

to set the influence aside."  *Id.* at 1373.  However, the risk of actual bias does not rise to an

unconstitutional level merely because there is an appearance of bias, without there also being a

high risk of bias.  *Suh,* 630 F.3d at 691 (finding no unconstitutional risk of bias where a judge

was not aware of a purported relationship between himself and the family of the victim in a

murder case).  There are a limited set of circumstances that meet this standard: (1) when there is

actual bias; (2) "when a judge earlier had significant, personal involvement as a prosecutor in a

critical decision regarding the defendant's case"; (3) when a judge has a financial interest in the

case's outcome; and (4) when a judge becomes "personally embroiled" with a litigant.  *United States v. Williams*, 949 F.3d 1056, 1061  (7th Cir. 2020) (citations omitted).

Here, Shannon argues that Judge Bruce's pattern of ex parte communications with the Office in his case and others meets this constitutional standard because the ex parte communications showed Judge Bruce was actually biased against him and in favor of the United States.  In *United States v. Williams*, 949 F.3d 1056 (7th Cir. 2020), the Seventh Circuit addressed due process arguments regarding Judge Bruce presiding over a criminal trial during the time period he was engaging in improper ex parte communications with the Office.  Relying on the same ex parte communications Shannon highlights in his brief, the Seventh Circuit rejected the arguments Shannon now seeks to raise.  With regard to actual bias and the four circumstances where courts have found an unconstitutional potential for bias under the Due Process Clause, the Seventh Circuit observed that Williams's case "does not fit into these buckets":

> Williams has not provided any evidence of actual bias. To the contrary, the Special Committee found "no evidence and received no allegation that Judge Bruce's conduct or ex parte communications impacted any of his rulings or advantaged either party." It is undisputed that none of the ex parte communications concerned Williams's case. Nor is there any evidence that Judge Bruce had a pecuniary interest in the outcome, previously worked on the case as a prosecutor, or became "personally embroiled" with the parties.

*Id.*  at 1061-62.  Williams argued that an exchange in which Judge Bruce stated that he did not think a prosecutor was "sneaky" was "proof of Judge Bruce's personal bias in favor of the government because he 'personally vouch[ed] for [the prosecutor's] integrity.'"  *Id.* at 1062.  The Seventh Circuit rejected this argument, finding "nothing improper about this exchange, which occurred before both parties, on the record, in open court, and outside the presence of the jury."  *Id.*  Moreover, the Seventh Circuit rejected Williams' argument that Judge Bruce's preexisting

friendship with specific members of the prosecution team in Williams' case created a due

process violation, finding that Williams had presented no evidence to rebut the presumption that

judges are capable of rising above such potential biasing influences.  *Id.*

Unlike *Williams*, Judge Bruce did engage in ex parte communications regarding

Shannon's case.  One ex parte communication was discovered regarding Shannon's sentencing

date.  Pl. Ex. E (Doc. 14-2).  The United States Probation Office had emailed Judges Bruce,

Baker, and Long, their law clerks, Staci Klayer (who was at the time a paralegal at the United

States Attorney's Office in Urbana), and AUSA Eugene Miller asking the judges to not schedule

hearings on the training dates if possible.  One of the training dates was September 11, 2017.

Judge Bruce replied to all: "Shawn Shannon re-sentencing set for September 11. Nice."  *Id.*  A

few days later Ms. Klayer replied only to Judge Bruce: "Sounds like the probation officer

assigned to this case needs to stay here and work!"  Judge Bruce replied only to Ms. Klayer.

"Yep. Don't think its [sic] moving. . . . . ."  *Id.*

Shannon argues that the emails related to his case, as well as others, show not only the

appearance of bias, but *actual* bias.  With regard to the ex parte email exchange in his own case,

Shannon argues:

> These ex parte communications with the United States Attorney's office show not
> only Judge Bruce's and Ms. Klayer's unwillingness to reschedule Shawn's
> sentencing, but also their eager anticipation of the sentencing. This exchange
> shows Judge Bruce's bias as well as the mutual understanding of that bias
> between Judge Bruce and Ms. Klayer. The exchange raises the suspicion that
> Judge Bruce and members of the U.S. Attorney's office had previously
> communicated about Shawn's sentencing. One interpretation could be that Ms.
> Klayer was telling Judge Bruce that the date of sentencing should not be moved,
> which he acknowledged in his response. This raises concern about the level of
> control and influence members of the U.S. Attorney's office staff had over Judge
> Bruce.

Pet. Memo. at 29-30 (Doc. 11).  The Court finds Shannon's interpretation of the emails is not the most logical one—rather than "eagerly anticipating" sentencing, it is far more likely that a judge would not want to move a scheduled hearing that neither party had requested to move.  Contrary to Shannon's interpretation, the Court does not find this email supports an inference that Judge Bruce had any bias against Shannon.  And the *Williams'* case forecloses any argument of actual bias stemming from the ex parte communications in other cases as well.  *Williams,* 949 F.3d at 1061-62.

In supplemental briefing, Shannon also argues that Judge Bruce's actual bias was evident from Judge Bruce's comments at Shannon's sentencing hearing.  Shannon argues that Judge Bruce's comments praising trial counsel's job at trial, "shows Judge Bruce's bias toward the Government and his effort to discourage Mr. Shannon from exercising his appellate rights and claim ineffective assistance of counsel."  Pet. Supp. at 8 (Doc. ).  Further, Shannon argues that Judge Bruce showed his bias at sentencing when he called Shannon's defense "ridiculous":

> One last word in general. A lot of, a lot of the background noise in this case was about some alleged conspiracy, trying to shift the blame to the victim or his family. Let me tell you as someone who has sat through, again, many of these trials, which gives me an advantage over anybody who is simply an outsider and this is the first time they've ever been involved in something like this, the idea that there would be a conspiracy -- to hold that idea is patently ridiculous. It is someone who is willing to believe anything rather than believe the truth.
>
> But, you know, we're all human beings. For hundreds and hundreds of years, good men, good women, good people of faith believed the earth was flat. You could not convince them otherwise. It was heresy to suggest that the earth was round.
>
> For centuries, people believed that the sun revolved around the earth. Even when confronted with evidence that overwhelmingly proved it did not, they would believe the sun revolved around the earth. It doesn't mean that they are stupid. It simply means they refuse to accept clear evidence.

R. 126 at 60-61.  Shannon argues that "[t]hese statements leave no doubt that Judge Bruce was not an impartial and unbiased arbiter of the law, but took on the role of the trier of fact, favoring

the [g]overnment, and undermining the public's confidence in the judicial process."  Finally,

Shannon argues that Judge Bruce discouraged Shannon from exercising his right to appeal:

> Frankly -- and I need to say this on the record also -- I struggled with coming up
> with the appropriate sentence. I second-guessed myself, third-guessed myself, and
> fourth-guessed myself. If this case were to come back for resentencing for some
> reason, I am not sure I would impose the same sentence again. Part of me thought
> I should have imposed a higher sentence, and I might do that in the future….Mr.
> Shannon, these are your appeal rights. You have the right to appeal your
> conviction and the sentence imposed. That's part of the reason I wanted you to
> walk in with eyes wide open as to my thoughts behind that sentence I just gave
> you. I'm not sure it would be the same if I did it again, but I want to make sure
> you know your appeal rights as well.

R. 126 at 74-76.

Contrary to Shannon's bold inferences, the Court does not find that these comments—

made in open court long after the jury had entered their verdict—show evidence of actual bias.

At this same hearing, Judge Bruce sentenced Shannon to only sixty years' imprisonment, a

ninety percent variance from the guidelines range and far less than what was recommended by

the government.  R. 102; R.112.  Judge Bruce's candid comments about his struggle to reach this

sentence was only meant to provide Shannon with further information and show that Judge

Bruce had erred on Shannon's side when reaching a lower sentence.  Moreover, Judge Bruce's

comments regarding Shannon's defense were made long after the trial had been decided and

were made within the context of explaining and justifying Shannon's sentence.  The Court

cannot find any evidence of actual bias from Judge Bruce's comments at Shannon's sentencing

hearing.

Accordingly, Shannon has only showed that Judge Bruce's ex parte communications

raise the appearance of bias.  As stated above, the risk of actual bias does not rise to an

unconstitutional level merely because there is an appearance of bias, without there also being a

high risk of bias.  *Suh,* 630 F.3d at 691 (finding no unconstitutional risk of bias where a judge

was not aware of a purported relationship between himself and the family of the victim in a murder case). And in *Williams,* the Seventh Circuit found that none of the four circumstances that courts have previously found meet this standard applies. *Williams,* 949 F.3d at 1061-62. Shannon does not present any argument to the contrary. Therefore, Shannon's due process claim is denied.

### C. Shannon is Not Entitled to a New Trial Because of Judge Bruce's Violation of 28 U.S.C. § 455(a).

After hinting in earlier filings, in Shannon's second supplemental brief filed on November 2, 2020, he for the first time asserts that he is also claiming that he is entitled to a new trial because Judge Bruce's failure to recuse himself violated 28 U.S.C. § 455(a) and the violation was not harmless. While Shannon has not sought to file a motion to amend his pleadings in order to bring this claim, as the government has not objected to or otherwise chosen to respond to Shannon's filing, the Court allows Shannon's earlier motions to be very liberally construed as having raised this claim.

Nonetheless, the Court finds that a claim of a violation of the federal recusal statute is not cognizable in collateral review. As stated above, a petitioner may avail himself of § 2255 relief only if he can show that there are "flaws in the conviction or sentence which are jurisdictional in nature, constitutional in magnitude or result in a complete miscarriage of justice." *Boyer v. United States*, 55 F.3d 296, 298 (7th Cir. 1995), *cert. denied*, 116 S. Ct. 268 (1995). Section 2255 is limited to correcting errors that "vitiate the sentencing court's jurisdiction or are otherwise of constitutional magnitude." *Guinan v. United States*, 6 F.3d 468, 470 (7th Cir. 1993) (citing *Scott v. United States*, 997 F.2d 340 (7th Cir. 1993)). A § 2255 motion is not a substitute for a direct appeal. *Doe v. United States*, 51 F.3d 693, 698 (7th Cir. 1995), *cert. denied*, 116 S.

Ct. 205 (1995); *McCleese v. United States*, 75 F.3d 1174, 1177 (7th Cir. 1996).  Here, the Court

has already determined that Shannon has not shown a constitutional error as a result of Judge

Bruce presiding over his trial as the Court has found there was no due process violation.

Shannon has not presented any argument for why a violation of the federal recusal statute could

be considered jurisdictional in nature or qualify as a miscarriage of justice.  Moreover, even if

the error is not harmless, the Seventh Circuit has held that "not every error is corrigible in a

postconviction proceeding, even if the error is not harmless*." Hawkins v. United States*, 706

F.3d 820, 823 (7th Cir.), *opinion supplemented on denial of reh'g,* 724 F.3d 915 (7th Cir. 2013)

("There is a difference between reversing an error on appeal and correcting the error years

later. ").  Accordingly, the Court finds that Shannon's claim cannot be raised in his § 2255

motion.

       Regardless, even Shannon could raise this claim and the harmless error standard applied,

the Court finds that the error is harmless.  Unlike the due process clause, under the federal

recusal statute an appearance of bias alone is sufficient to trigger recusal because the statute

requires a judge to recuse himself from "any proceeding in which his impartiality might

reasonably be questioned."  28 U.S.C. § 455(a).  The Seventh Circuit has now addressed Judge

Bruce's failure to recuse himself under the federal recusal statute in light of the *ex parte*

communications in three cases: *United States v. Atwood*, 941 F.3d 883 (7th Cir. 2019), *United

States v. Williams*, 949 F.3d 1056 (7th Cir. 2020), and *United States v. Orr*, 969 F.3d 732 (7th

Cir. 2020).  The government conceded in all three of these cases that Judge Bruce's conduct gave

the appearance of impartiality, but argued that the error was harmless.  The Seventh Circuit

evaluated the three factors outlined in *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S.

847, 864 (1988), to determine whether Judge Bruce's violation of § 455(a) was harmless error*:*

"(1) the risk of injustice to the parties in this case, (2) the risk of injustice to parties in future cases, and (3) the risk of undermining public confidence in the judicial process." *Atwood*, 941 F.3d at 885. These three cases heavily control the Court's analysis here, and, accordingly, the Court will discuss each one in turn.

In *Atwood*, the defendant had pled guilty and Judge Bruce presided over his sentencing. The Seventh Circuit found that all three factors weighed in favor of the defendant. For the first *Liljeberg* factor, fairness to the litigants in the case, the Seventh Circuit found that the discretion and open-endedness of a sentencing hearing "invites the risk that a judge's personal biases will influence or appear to influence the sentence he imposes," and that a sentencing hearing would impose little risk of unfairness to the government other than the administrative cost of resentencing. *Id.* The Seventh Circuit also found that the second factor, the risk of injustice to future litigants, also favored resentencing because enforcing § 455(a) in that case may encourage "judges to exercise caution in their communications." *Id.* The third *Liljeberg* factor, the Seventh Circuit held, also favored resentencing: "In sentencing, the most significant restriction on a judge's ample discretion is the judge's own sense of equity and good judgment. When those qualities appear to be compromised, the public has little reason to trust the integrity of the resulting sentence." *Id.* at 886. Accordingly, the Seventh Circuit remanded for resentencing by a different judge. *Id.*

By contrast, in *Williams,* the Seventh Circuit found the facts distinguishable from *Atwood* because Judge Bruce had only presided over the jury trial and not the sentencing hearing. "This distinction matters because judges generally have more discretion over sentencing than the outcome of a jury trial." *Williams*, 949 F.3d at 1064. Turning to the *Liljeberg* factors, the Seventh Circuit found all factors pointed against granting a new trial. For the first factor, the

unfairness to the parties in the case, the Seventh Circuit found that there was little risk of

unfairness to Williams:

> First and significantly, while some ex parte communications included Peirson or Klayer, it is undisputed that none of these communications concerned Williams's case. There is also no evidence that either Peirson or Klayer had any influence on the outcome here. Second, although Judge Bruce presided over Williams's trial, he was not the trier of fact making the ultimate determination of whether the government had proved Williams guilty beyond a reasonable doubt. A jury found Williams guilty, and Williams has not questioned the jury's impartiality. Third, Judge Bruce made minimal rulings before and during trial, none of which either party challenges on appeal. As to his pre-trial rulings, Judge Bruce granted routine scheduling and appearance motions for both parties. He denied the government's discovery motion as moot, but he granted the government's motion to bar an alibi defense because Williams failed to file a response or object. Judge Bruce also denied as moot Williams's motion in limine to bar the government from introducing evidence of prior convictions because the government represented that it did not intend to introduce such evidence in its case in chief. The court specifically noted in its order that "should circumstances change at trial, and the government attempt to introduce such evidence during its case in chief, Defendant may revive his motion." Williams has not argued that any of these rulings prejudiced him. Indeed, the rulings were not controversial or contested and generally pertained to routine matters.

> As to his trial rulings, Judge Bruce equally granted and denied objections from both parties. Judge Bruce sustained eight out of eighteen of defendant's objections and two out of four of the government's objections. He also denied Williams's Rule 29(a) motion at the close of the government's case and his renewed Rule 29 motion at the close of all evidence. None of these rulings suggest that Judge Bruce's appearance of bias had any impact on the outcome of Williams's trial. Nor does Williams argue that any particular ruling was prejudicial. Williams attempts to rebut these facts by arguing that under the government's view, "the harmlessness inquiry would always require proof of actual bias, and would thus render § 455(a)'s prohibition on the appearance of bias a nullity." We disagree. The Supreme Court in *Liljeberg* cautioned that "[a]lthough § 455 defines the circumstances that mandate disqualification of federal judges, it neither prescribes nor prohibits any particular remedy for a violation of that duty." *Liljeberg*, 486 U.S. at 862, 108 S.Ct. 2194. Rather it is up to each court to determine what remedy is appropriate on a case-by-case basis. Williams has the burden of showing that at least some of the *Liljeberg* factors counsel in favor of a new trial. A mere statutory violation alone does not automatically entitle him to a new trial.

> Also for the first factor, we must consider the risk of injustice to the government if a new trial is granted. We agree with the government that the costs of retrial

> pose a significant risk of injustice to it. The government would likely spend valuable time and money to retry this case thereby diverting resources from other cases. *See United States v. Cerceda*, 172 F.3d 806, 814 (11th Cir. 1999) (en banc) (per curiam). Williams's case is distinguishable from *Atwood* in that regard. Unlike Williams, Atwood pleaded guilty and requested a resentencing by a different judge. *Atwood*, 941 F.3d at 884. "[A] remand for resentencing, while not costless, does not invoke the same difficulties as a remand for retrial does." *Rosales-Mireles v. United States*, ⎯ U.S. ⎯, 138 S. Ct. 1897, 1908, 201 L.Ed.2d 376 (2018) (citing *Molina-Martinez v. United States*, ⎯ U.S. ⎯, 136 S. Ct. 1338, 1348–49, 194 L.Ed.2d 444 (2016)). This factor favors denying Williams's request for a new trial.

*Id.* at 1064–65.  The Seventh Circuit also found that the second *Liljeberg* factor, the risk of injustice to future litigants, counseled against a new trial.  While the defendant argued, similar to *Atwood*, that a new trial would serve to warn judges and litigants to be more careful in the future, the Seventh Circuit found that the Special Committee's Report had already minimized the risk to future litigants.  *Id.* at 1065.  The Seventh Circuit also noted that Judge Bruce had changed his practices.  *Id.*

The *Williams* court also found that the third *Liljeberg* factor, the risk of undermining the public's confidence in the judicial process was a "close call" but also counseled against a new trial:

> Unlike a sentencing, where "the most significant restriction on a judge's ample discretion is the judge's own sense of equity and good judgment," *Atwood*, 941 F.3d at 886, a judge has less discretion over the outcome of a jury trial. We can imagine a case where a judge has substantial discretion and his rulings have a significant impact on the outcome, thus undermining the public's confidence in the judicial process. But this is not one of those cases.

*Id.*  Additionally, the Seventh Circuit relied on the findings of the Special Committee that there was no evidence that Judge Bruce's conduct had impacted any rulings or advantaged either party, where was "overturning a jury verdict based purely on the appearance of bias creates a risk that the public will lose confidence in the judicial process."  *Id.* at 1066.

Finally, in *United States v. Orr*, 969 F.3d 732 (7th Cir. 2020), the Seventh Circuit again addressed Judge Bruce's ex parte communications under the federal recusal statute and held that Judge Bruce's failure to recuse was *not* harmless error.  In *Orr,* like *Williams,* Judge Bruce had presided over the trial, but not the sentencing hearing.  *Id.*  Under the first *Liljeberg* factor, the Seventh Circuit noted that Judge Bruce had made discretionary calls in *Orr* that made it possible that the district court's personal biases influenced the outcome of the case.  *Id.* at 471.  Moreover, while retrying a case risks some injustice on the government, "the risk of injustice to the government is directly related to the complexity of the trial," and Orr's trial had been short and non-complex.  *Id.*  Accordingly, the Seventh Circuit found that the first factor favored Orr.  As for the second *Liljeberg* factor, the risk of injustice to future parties, the Seventh Circuit agreed with the reasoning in *Williams* and found the second factor favored upholding Orr's conviction.  The third factor, "the risk of undermining the public's confidence in the judicial process,"  the Seventh Circuit found favored a new trial:

> Like the defendant in *Williams*, Orr was found guilty by a jury of his peers. Although in *Williams* we decided that the jury finding the defendant guilty was "significant," we envisioned "a case where a judge has substantial discretion and his rulings have a significant impact on the outcome, thus undermining the public confidence in the judicial process." 949 F.3d at 1065. Such a case is now before us. Judge Bruce exercised substantial discretion by admitting evidence of Orr's drug dealing and by permitting the prosecutor to cross-examine Orr on his felony conviction for dealing drugs. These evidentiary decisions were particularly consequential because they bolstered the prosecution's case, which rested on circumstantial evidence and credibility calls. Given these discretionary rulings, upholding Orr's conviction may damage the public's confidence in the impartiality of the judiciary. For these reasons, the final *Liljeberg* factor favors vacating Orr's conviction.

*Id.* at 741–42.  Accordingly, as two of the three factors favored vacating Orr's conviction, the Seventh Circuit found the error was not harmless and vacated Orr's conviction and sentence.

Here, Shannon argues his case is similar to *Orr* and distinguishable from *Williams* in that his trial involved significant discretionary decisions by Judge Bruce because Judge Bruce ruled on the admissibility of A.W.'s testimony.  The Court does not agree.  Under the first *Liljeberg* factor, the risk of injustice to the parties, Shannon, like Orr, faces some risk of injustice given the discretionary decision to admit the testimony of A.W.  However, the Court has already determined above that admitting this testimony was not a close call.  Moreover, unlike the discretionary calls in *Orr,* the Court found above that there was overwhelming evidence of Shannon's guilt even without the admission of A.W.'s testimony.  While Shannon also argued that there was evidence of actual bias in statements made by Judge Bruce, as discussed above, the Court does not agree.

On the other hand, unlike *Orr*, the risk of injustice to the government in this case is substantial.  The trial was extensive and involved multiple expert witnesses as well as the testimony of the minor victim and his family.  Unlike *Orr* and *Williams,* the emotional costs of retying this case are important factors and present an incredible risk of injustice to the victim in this case.  Moreover, the time and resources required to retry this case would divert the government's resources from other cases.  *Williams*, 949 F.3d at 1065 (citing *United States v. Cerceda*, 172 F.3d 806, 814 (11th Cir. 1999)).  Accordingly, the first *Liljeberg* factor favors against a new trial for Shannon.

As to the second *Liljeberg* factor, the risk of injustice in future cases, both the *Williams* and *Orr* decisions found that the public reprimand was sufficient to curb Judge Bruce's misconduct. Shannon's supplemental briefs fail to meaningfully distinguish the holdings of *Williams* and *Orr*, and the Court finds that this factor against favors against a new trial for Shannon.

Finally, the third *Liljeberg* factor, the risk of undermining the public's confidence in the judicial process, the Court also finds weighs against a new trial for Shannon.  While Shannon again equates his case with *Orr*, the Court does not find that there were significant discretionary decisions at play that would have impacted the case.  Like *Williams,* "overturning a jury verdict based purely on the appearance of bias creates a risk that the public will lose confidence in the judicial process."  *Williams*, 949 F.3d at 1066.

Accordingly, even if Shannon could raise his non-constitutional claim that he is entitled to a new trial because of Judge Bruce's violation of the federal recusal statute, the Court finds that the error was harmless in Shannon's case.  Therefore, his claim is denied.

### D.  Violations of the Rules of Professional Conduct Are Not a Separate Ground for Granting a New Trial in a § 2255 Motion.

Separately from his due process claim, Shannon argues that he is entitled to a new trial due to the misconduct of the Office.  Shannon argues that by communicating with Judge Bruce ex parte and/or failing to supervise paralegals who were communicating with Judge Bruce ex parte, lawyers in the Office violated the Illinois Rules of Professional Conduct.  Specifically, Shannon argues that lawyers in the Office violated Rule 3.5(b) of the Illinois Rules of Professional Conduct, which states "[a] lawyer shall not communicate ex parte with [a judge] during the proceeding unless authorized to do so by law or court order."  Additionally, Shannon argues they violated Rule 8.4(f), which states it is professional misconduct for a lawyer to "knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law."  Shannon argues that if the government had disclosed its

misconduct to Shannon, he would have requested and would have been successful in having Judge Bruce removed as the judge presiding over his trial.

As the government points out, Shannon has not cited any authority for the proposition that a violation of the Rules of Professional Conduct is itself a separate basis for granting a new trial in a criminal case. Shannon's claim is similar to an allegation of a *Brady* violation. In *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1963)*,* the Supreme Court held that suppression of evidence that is material to either guilt or punishment justifies a new trial "irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Here, however, Shannon claims that the government withheld evidence that would have led to a recusal of Judge Bruce, rather than any evidence that would have been material to his guilt or innocence. And, the Court has already determined that Shannon cannot proceed on his claim that his due process rights were violated because he was deprived a right to a fair trial before an unbiased judge. The Office's misconduct alone does not provide a separate basis for vacating Shannon's criminal convictions.

### IV.  CERTIFICATE OF APPEALABILITY

If Petitioner seeks to appeal this decision, he must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c) (providing that an appeal may not be taken to the court of appeals from the final order in a § 2255 proceeding unless a circuit justice or judge issues a certificate of appealability). A certificate of appealability may issue only if Petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Under this standard, Shannon must demonstrate that "reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). Here, the Court is hesitant to preclude

an appeal with regards to the issues of whether Shannon received ineffective assistance of counsel and whether he is entitled to a new trial under the due process clause due to Judge Bruce's ex parte communications. Accordingly, the Court grants a certificate of appealability on these issues. However, the Court declines to grant a certificate of appealability regarding Shannon's argument that he is entitled to a new trial due to the misconduct of the United States' Attorney's Office because no reasonable jurist could debate whether the Office's misconduct alone could be a separate ground for relief.

## V.  CONCLUSION

For the reasons stated, Petitioner Shawn Shannon's Amended Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 11), which replaced his original Motion (Doc. 1), is DENIED. The Court GRANTS a Certificate of Appealability on the issues of whether Shannon received ineffective assistance of counsel and whether he is entitled to a new trial under the due process clause due to Judge Bruce's ex parte communications, but DECLINES to issue a Certificate of Appealability on his remaining claim. This case is CLOSED. The Clerk is DIRECTED to prepare the Judgment.


Signed on this 25th day of November 2020.

s/ James E. Shadid
James E. Shadid
United States District Judge